40 C.C.P.A.(Patents)

**Application of O'KEEFE.**

**Patent Appeals No. 5940.**

United States Court of Customs and Patent Appeals.

March 11, 1953.

Jewett, Mead, Browne & Schuyler, Washington, D. C. (Francis C. Browne and William A. Smith, Jr., Washington,. D. C., of counsel), for appellant.

E. L. Reynolds, Washington, D. C., (S. W. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the action of the Primary Examiner in finally rejecting claims 15 through 20 of appellant's application for a patent on an alleged invention which relates particularly. to features of stove construction that can be incorporated advantageously in modern cooking stoves or ranges such as are commonly termed console type stoves.

No claims were allowed and all of them were rejected on two independent grounds; namely, (1) as unpatentable over the disclosure of the patent of Maul, 1,505,273, issued August 19, 1924, and (2) Maul in view of the disclosure of the patent to Lindemann, 1,772,870, issued August 12, 1930.

The structure of appellant's stove is provided with a panel at its front, and the controls or knobs disposed on the panel are protected from the heating effect of a cooking compartment therebelow.

Claim 15 is illustrative:

"15. A stove including a cooking compartment having a front opening, a door at the front of the stove normally closing the opening, a fixed upwardly and inwardly extending panel at the front of the stove above the door, a control element at the front of the panel, and a fixed heat deflector between the top of the opening. and said panel in the path of heat flowing up from the opening at the front of the stove and directing such heat forward and away from the stove and clear of the control element, the deflector being curved upward and forward to have a concave heat directing surface and the forward portion of the panel being contiguous with the forward portion of the deflector and forming an acute angle therewith."

The state of the art and its unsolved problem was thus described so far as pertinent in the following excerpt from appellant's brief:

"Conventional domestic cook stoves have long been made with an oven closed by a door, and with a bank of cooking burners at the top of the stove. The gas valves are operated by control elements or knobs located at the front of the stove substantially at a level with the cooking burners and above the oven door. * * * with the conventional stove construction, use of the oven results in heating of the controls to the point where they are uncomfortable, if not actually dangerous, to use."

The desired effect is accomplished, as indicated in appellant's drawings, because the flow of hot air from the oven is ultimately directed horizontally, or substantially so, from the stove by the intermediate or concave section along the bottom and protruding edge of the panel, which structure acts as a heat deflector causing the hot gases issuing from the oven to be directed clear of the control knobs so that they remain cool.

The patent to Maul relates to an improvement in hotel oven structures; one oven above the other, in a unitary structure. having separate oven compartments, the doors of which were often opened partially to cool off the double oven or

retard baking therein. **In practice, the** lower oven became practically useless:

"  *   *   *  I find the trouble lies in the practice of opening the lower oven door, permitting heated oxygen exhausted air to escape from the lower oven right in the path of the primary air supply to the burners of the upper oven, and since warmed burned air and cold gas do not afford a proper or perfect combustion, the burners of the upper oven do not function properly—consequently poor baking. The chefs or cooks therefore discontinue to use the lower oven in order to obtain good results with the upper oven."

To remedy that situation, Maul proceeded (1) to "partition off, shield or inclose the air mixers of the upper oven burners," and then (2) "provide an independent source of air for such burners." Maul explains in his specification:

"  *   *   *  In partitioning off the air mixers of the upper oven burners, I prevent any heated and burned air, escaping or radiating from the lower oven burners, from being drawn in or entering such air mixers, and since I provide a remote source of air for the upper oven burners, proper combustion is assured. It is therefore obvious that the lower oven can be used, simultaneously with the upper oven, as intended, without destroying or interfering with perfect baking in the upper oven."

Each of the respective ovens, upper and lower, disclosed by Maul is provided with a burner for burning gas. These burners have air mixers into which extend the jets of valves connected to gas supply pipes supported in brackets on the front wall of the oven structure. In order that the use of the lower oven may not interfere with the operation of the upper oven, the supply of air to the burners of the upper oven is isolated or shielded from any heated air that may be emitted from the doorway of the lower oven by these two structural changes or additions to the usual form of double or superposed ovens.

A sectional or two-part casing or shield is mounted about the valves and in front of the air mixers of the burners for the upper oven hereinbefore described. The casing has been defined by Maul as an element comprising two oblong members, upper and lower, placed in abutting relation and having flanges at each end adapted to be fastened to the front wall of the oven structure by stove bolts, so that the mounted casing will be stationary in its position under the valves connected to the gas supply pipes of the burners for the upper oven.

Maul further provides that the element which constitutes the upper member of the casing hereinbefore described is detachably mounted on the upper edges of the casing member against the front wall of the oven structure. Said upper casing member is provided with three openings for the location of the controlling handles and stems of the upper valves; and in addition to such openings there is a depressed or recessed portion adjacent the pilot opening in the front wall of the oven structure. Air is supplied to the casing, comprising the upper and lower members, by a wide horizontal flue. Through its top wall and the apertured bottom wall of the upper oven, that oven receives fresh air.

Maul describes the pertinent remainder of his structure and the function thereof in his specification as follows, numerical references to the drawing being here omitted:

"  *   *   *  The rear wall of the flue has two openings communicating with vertical flues at the rear wall of the oven structure, the said vertical flues having the lower ends thereof open at the bottom of the oven structure.  *   *   *  it will be noted that the smoke or exhaust flue has its lower end closed in a plane below the upper closed ends of the air intake flues, and the flue merge into a wide air intake passage at the lower part of the oven structure.

"  *   *   *  it will be noted that the lower oven door may be left ajar with-

out any danger of the heated or burned air from the oven doorway entering the casing about the upper valves and consequently the lower oven can be operated in the usual manner without interfering with the operation of the upper oven. This upper oven will receive its air from the rear part or bottom of the oven structure and the same source of air serves the air mixers of the upper burners by reason of the casing communicating with the forward end of the flue. The arrangement of the casing about the valves does not interfere with the operation of said valves nor prevent adjustment of the air mixers, for the reason that the [upper] casing member may be easily removed."

During the prosecution of his application in the Patent Office appellant urged that the manifold or casing member which the Board of Appeals considered to be a deflector by which the three control members of the burners of the Maul reference "are materially shielded" from the heating effect of the escaping gases of the lower oven, was actually one of the two casing members which together were employed to "isolate or shield the supply of air" to the upper oven burners, but not to isolate or shield the control handles and stems of the upper valves.

The patent to Lindemann relates to improvements in the operation of gas stoves. The improvements consist mainly of a top front structure portion or casing disposed and extending forward, which frame or casing houses and conceals controlling elements of the stove. The object of the structure is not only to protect the parts thus enclosed from injury but also to guard them against accidental operation. A further object of the specified structure of Lindemann is to protect the clothes of the operator of the controls from flame and heat and at the same time present a stove front of finished and neat appearance. Beneath the mounted casing hereinbefore described a drip pan and a utility drawer are provided. Above said casing the grate of the stove is located. The drawings show the oven and a broiler vertically disposed beside the grate or burners and properly adapted to be supplied with heat therefrom.

Lindemann remarks in his specification and directs particular notice to the fact that the projecting front portion of the stove member hereinbefore described extends beyond the vertical plane of the valve operating means, as well as beyond the limits of the handles of the drip pan and the utility drawer. He then concludes:

"* * * Accordingly an operator, a housewife, or any other individual or object which approaches or passes closely in front of the stove cannot inadvertently open any of the burner valves. It is frequently the case that the clothing of an individual accidentally catches on the burner valve handles and inadvertently turns on the supply of gas thereby causing obvious dangers. The presence of this guard rail [projecting tip of the casing surface] prevents any such accidental opening or closing of the valves by reason of the fact that it protrudes beyond the outer limits thereof.

"The present improvements accordingly eliminate the usual open front at this part of the stove and therefore serve also to protect the clothing of the individual as well as the individual himself from the flames, heat and other dangerous characteristics of the burner areas, as well as from the heated metal portions of the stove."

The examiner finally rejected the claims on appeal in a decision containing but two short paragraphs:

"Claims 15 through 20 are rejected as unpatentable over Maul who shows a guard for the gas valves on a stove which deflects the hot gases from the oven away from the valves. No invention is seen in making the lower portion of a concave shape rather than as shown. Whether the manifold was covered by the guard also, would be but a matter of choice.

"Claims 15 through 20 are further rejected as unpatentable over Maul in view of Lindemann. Maul shows a shield used on a gas range to protect

the valves from the heat of an oven disposed below the valves. Lindemann shows the structure of a guard as shown by applicant. No invention is seen in using this guard which is shown to be old to deflect oven gases as clearly shown by Maul."

In sustaining the examiner's rejection, and in view of his more explicit statements in the subsequent answer requesting affirmance, the Board of Appeals conceded that appellant's claimed structural arrangement "doubtless is effective" to achieve the desired result defined by the appealed claims; and that Maul in the principal reference does not specifically refer to the shielding of the control members from the heating effect of the hot air escaping from his lower oven. The board held nevertheless that the structural changes over the art of record which appellant had produced did not require the exercise of the inventive faculty. The board reasoned that it would be obvious to any person skilled in the art to provide a deflector from the heat of an oven below, in view of the casing of Maul, which, in effect, functioned as a heat deflector for the control elements which were "materially shielded" within the casing.

In the rejection of the appealed claims on Maul in view of Lindemann, the members of the board said: "We think it is evident that if Lindemann's control panel were disposed over an oven instead of the utility drawer that is shown, it would inherently function as does appellant's device."

There is nothing disclosed by the record which actually indicates or suggests that Lindemann's substructure is concave or otherwise defined as a horizontally heat directing surface. On the contrary, as appellant urges, there is no suggestion nor "any reasonable basis for assuming that the materially different and non-functional under-construction of the Lindemann 'guard' should be employed to perform a totally different purpose in connection with the Maul construction. * * * nor does either of the patents suggest that any part of the Lindemann patent should or could be placed in the environment of the Maul construction for any purpose whatever."

The Patent Act of 1952, 35 U.S.C. § 103,[1] which took effect January 1, 1953, has apparently neither raised nor lowered the standard of invention:

"§ 103. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The rejection of the appealed claims solely on the complicated and controversial structure disclosed by Maul was apparently not a proper disposition of such claims by the tribunals of the Patent Office. The same conclusion must be likewise applied to their rejection of the claims

1. The following explanatory excerpt is quoted from Senate Report No. 1979, Committee on the Judiciary of the Senate, 82nd Congress, 2nd Session, Revision of Title 35, United States Code:
"Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the courts. An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. That has been expressed in a large variety of ways in decisions of the courts and in writings. Section 103 states this requirement in the title. It refers to the difference between the subject matter sought to be patented and the prior art, meaning what was known before as described in section 102. If this difference is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented." U.S.Code Congressional and Administrative Laws 1952, p. 2399.

**772**

on the combination of the references of Maul and Lindemann. In re Lee, 193 F. 2d 186, 39 C.C.P.A., Patents, 752, 756–757; International Standard Electric Corp. v. Kingsland, 83 U.S.App.D.C. 355, 169 F. 2d 890. These last two cases stand for the proposition that the Primary Examiner and the Board of Appeals are required both by the law and the rules of practice of the Patent Office to clearly state the reasons for their opinion and the applicant need not specifically request that such be done.

 Invention may be involved in the development of a crowded art by a change in the proportions of a critical element of an operating device. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523. There Chief Justice Taft, in writing the opinion for a unanimous court, pointed out that the disclosure of a meritorious improvement on a machine, substantially advancing the art, is entitled to a liberal construction.

The Board of Appeals in ascribing to the manifold or casing of Maul a function which it did not possess, but which is possessed by appellant's construction, departed from precedents which have controlled the decisions of the Patent Office in the past. Ex parte Beggs, 69 U.S. P.Q. 208. The case of Ex parte Wirth, 59 U.S.P.Q. 72, discloses a rule of patent law enunciated by the Board of Appeals to the effect that a general resemblance to an element in the prior art does not necessarily cause the rejection of claims which recite an organization of elements not found or suggested in the prior art.

With respect to changes basically analogous to those made by appellant in the device at bar, this court significantly remarked in the recent case of In re Bisley, 197 F.2d 355, 363, 39 C.C.P.A., Patents, 982, 983:

"* * * When viewed after disclosure by appellant these changes seem simple and such as should have been obvious to those in the field. However, this does not necessarily negative invention or patentability. Goodyear Tire & Rubber Co., Inc., v. Ray-O-Vac Company, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; In re De-

Lancey, 159 F.2d 737, 34 C.C.P.A., Patents, 849. Moreover, the conception of a new and useful improvement must be considered along with the actual means of achieving it in determining the presence or absence of invention. In re DeLancey, supra. * * *"

Appellant states in his argument that the panel defined by the appealed claims employs and operates on aerodynamic principles, adapting them to the environment of his device. While such a feature is neither claimed nor explained in his application, the omission is not fatal to the allowance of the claims, inasmuch as his specification and claims demonstrate to any person skilled in the art the structure which operates to produce the desired result.

The improvement defined by the appealed claims appears to constitute a difference over the prior art sufficiently important to warrant a patent.

For the reasons hereinbefore stated, the decision of the Board of Appeals is reversed.

Reversed.

WORLEY and COLE, Judges, dissent.