Maria Luisa DE BURGH, Executrix of the Estate of Albert R. DeBurgh, Deceased, Plaintiff,

v.

KINDEL FURNITURE COMPANY, Charles M. Kindel and the Rapids-Standard Company, Inc., Defendants.

Civ. A. No. 1598.

United States District Court
W. D. Michigan, S. D.

Oct. 19, 1954.

Roberts B. Larson, Washington, D. C., and Glenn B. Morse, Grand Rapids, Mich., for plaintiff.

Peter P. Price, Grand Rapids, Mich., Nathan C. Snyder, Grand Rapids, Mich.,

Frank E. Liverance, Jr., of counsel, Grand Rapids, Mich., for defendants.

STARR, Chief Judge.

■ Albert R. DeBurgh as the patentee and owner of United States Letters Patent No. 2,317,675 issued April 27, 1943, for a "conveyer system" filed complaint alleging infringement of said patent by defendants Kindel Furniture Company and Charles M. Kindel. De-Burgh asked for an injunction against further infringement, an accounting of profits, treble damages, costs, and attorney fees. On its motion, the Rapids-Standard Company, Inc., a Michigan corporation, was granted leave to intervene as a party defendant and file answer.[1] The defendants Kindel Company and Charles M. Kindel, and defendant Rapids-Standard, in their respective answers denied infringement and alleged that the DeBurgh patent was invalid because of prior art anticipation and lack of invention. In their supplemental answer the defendants asked for a declaratory judgment determining that the DeBurgh patent was invalid, and that the accused conveyer structure manufactured by defendant Rapids-Standard and used by the Kindel Company did not infringe.[2] The defendants' allegation of invalidity of patent and their request for a declaratory judgment of invalidity, put in issue the question of the validity of all claims of the patent in suit. Kawneer Co. v. Pittsburgh Plate Glass Co., D.C., 109 F.Supp. 228. Albert R. DeBurgh died December 24, 1952, and in pursuance of stipulation it was ordered that Maria Luisa DeBurgh, executrix of his estate, be substituted in his place as plaintiff.

In support of their claim of invalidity of patent because of prior art anticipation and lack of invention, the defendants cite the following patents: Fitzhenry 76,619 issued April 14, 1868; Eppelsheimer 166,975 issued Aug. 24, 1875; Aiken 393,051 issued Nov. 20, 1888; Hogg 519,630 issued May 8, 1894; Baker 907,116 issued Dec. 22, 1908; Rebstock 1,505,971 issued Aug. 26, 1924; Knight 1,540,021 issued June 2, 1925; Olson 1,732,376 issued Oct. 22, 1929; Howe 1,733,409 issued Oct. 29, 1929; Francis 1,792,533 issued Feb. 17, 1931; Baker 1,831,283 issued Nov. 10, 1931; Dahms 1,889,274 issued Nov. 29, 1932; Hormel 1,914,806 issued June 20, 1933; Kimball et al. 2,090,129 issued Aug. 17, 1937; and Landahl 2,187,498 issued Jan. 16, 1940. The file wrapper indicates that of the above, only the Hogg, Rebstock, Knight, Francis, Baker, Dahms, Kimball et al., and Landahl patents were cited as references by the examiner. In their second supplemental answer and their answers to plaintiff's interrogatories and in their notice of prior art, the defendants also cite in support of their claim of invalidity: Klinik et al. 382,043 issued May 1, 1888; Taylor et al. 815,986 issued Mar. 27, 1906; Hutton 1,448,119 issued Mar. 13, 1923; Stutsman 1,534,334 issued April 21, 1925; Prince 1,716,664 issued June 11, 1929; Anderson 1,825,038 issued Sept. 29, 1931; and Taylor 1,835,823 issued Dec. 8, 1931. The defendants also alleged that the DeBurgh patent is invalid because prior to the al-

---

1. Rapids-Standard Company had agreed to save the Kindel Furniture Company harmless from any claim for infringement of the DeBurgh patent.

2. DeBurgh subsequently filed an amended complaint alleging that defendant Rapids-Standard Company was manufacturing and selling to others than the Kindel Company conveyer systems which infringed his patent. The defendants' motion for a separate trial of the issues of validity of patent and infringement as to the conveyer system installed in the Kindel factory, raised by DeBurgh's original complaint and the defendants' answers, was granted. Therefore, any issues relative to conveyer systems manufactured and sold by Rapids-Standard to others than the Kindel Company are not involved and are not considered in this opinion. That is to say, the only issues considered and determined in this opinion are the issues of validity of patent and of infringement as to the conveyer system manufactured by Rapids-Standard Company and installed by the Kindel Company in its factory.

leged invention and for more than two years prior to the filing of the application, all material and substantial parts and elements of the patent had been in public use and had been described in printed publications. Further, the defendants alleged that about 1928 or 1929 the Logan Company of Louisville, Kentucky, had designed and constructed a conveyer system which included the elements of the structure described and claimed in the patent in suit, and that the Logan conveyer was installed and thereafter operated in the plant of the Direct Action Stove division of the American Stove Company (now Magic Chef, Incorporated) at Lorain, Ohio.

As stated in the specifications, the patent in suit relates to a claimed improvement in the method of utilizing conveyers for the more expeditious and economical manufacture and finishing of furniture and other articles requiring a succession of operations, such as, for example, the sanding, staining, wiping, drying, sealing, decorating, lacquering, and varnishing of pieces of furniture. Claims 1, 3, 4, and 5, on which plaintiff bases her claim of infringement, and claim 11, which are reasonably illustrative of all claims, provide as follows:

"1. In combination, a conveyer means including a guideway leading through a succession of work stations, a work mounting pallet associated with the conveyer for guided travel therealong by the guideway through the work stations and means located at the work stations onto which the pallet will be directed by the guideway for a continuation of travel and for rotation while at the work stations without disassociation of the pallet from the guideway."

"3. In a system for (of) the character described, a conveyer means leading through a succession of work stations, work mounting pallets associated with the conveyer for travel in succession therealong, each independently of the others for variation in spacing and in-termittent travel, and means located at the work stations onto which the pallets will be directed by the guideway and supported for continuation of travel and for rotation at the work stations."

"4. In a system of the character described, a conveyer means leading through a succession of work stations, a power driven belt operable along the conveyer means, work mounting pallets associated with the conveyer means for travel therealong, cooperating means on the belt and on the pallets for the advancement of the pallets, and supports at the work stations onto which the pallets will be directed for conveyance through the stations and on which they may be rotated without disassociation from the conveyer means."

"5. In a system of the character described, a continuous guideway leading through a succession of work stations, a continuously moving belt operable along the guideway, conveyer rollers mounted along the guideway between the stations, work mounting pallets associated with the guideway for support and travel on said rollers and for guidance by the guideway in travel, cooperating means on the belt and on the pallets for the advancement of the pallets along the guideway and permitting variation in their spacing within predetermined limits, and supports at the work stations onto which the pallets will be directed for their continuation of travel through the station and for rotation."

"11. In a system of the character described, a main trackway leading through a succession of work stations, and a plurality of receiving trackways, each with an end terminating adjacent the main trackway, a belt guideway extending along the main trackway, and having a longitudinal slot, a conveyer belt mounted for travel in the guideway and hav-

ing abutments at spaced intervals therealong, a plurality of work mounting pallets mounted for travel on the trackways, a pivot and guide stud fixed to each pallet and extended downwardly therefrom into the guideway slot for engagement by a belt abutment for pushing the pallet along the trackway and for retaining the pallet against lateral displacement from the trackway, a caster bed located between the main trackway and the adjacent ends of the receiving trackways across which pallets may be transferred from the main trackway to any of the receiving trackways, and slotted guideways extending along the receiving trackways for reception of the pallet studs to retain the pallets against lateral displacement from these trackways while advanced therealong."

The patent in suit shows a combination of elements consisting of a trackway with mounted conveyer rollers, having a central guideway formed by two parallel spaced angle irons, within which travels a *power driven chain belt* extending throughout the full length of the conveyer. Attached to this moving belt are upright, spaced-apart lugs. Supported and traveling on the trackway are removably mounted work pallets or platforms upon which pieces of furniture or other articles are placed for transportation. These pallets or platforms are independent of each other and each has a central, fixed pin or stud extending down into the guideway to be engaged by the lugs on the power-driven belt, whereby the belt moves the pallets along the trackway without lateral displacement. The spacing between the lugs is considerably greater than the over-all length of each of the pallets. Located at different places along the conveyer are so-called work stations, and at each of these stations swivel casters replace the rollers on the trackway to facilitate the rotation of the pallets without their removal from the conveyer, and without their being lowered or raised from the level of the conveyer. These swivel casters support the pallets both for rotation and for travel through the work station, and means is provided for the transfer of the pallets from the main trackway to receiving trackways.

The accused conveyer structure manufactured by defendant Rapids-Standard Company and installed by defendant Kindel Company in its factory, consists primarily of a gravity conveyer system as distinguished from the powered conveyer system described in the claims of the DeBurgh patent and as shown in the drawings illustrating that patent.[3] The defendants' conveyer structure comprises a track consisting of a pair of side rails upon which are mounted freely rotatable skate wheels. Removably mounted work pallets or platforms, upon which articles of furniture are placed for transportation, rest upon the skate wheels. The conveyer track, except at points where it is raised to give gravity movement to the pallets, is inclined downwardly in the direction of the movement of the pallets through the conveyer system. In the center of the track, midway between the skate wheels, are located two spaced-apart angle irons which form a guideway. The pallets or platforms are independent of each other, and on the bottom of each pallet is a horizontally positioned skate wheel, rotatable about a vertical axis, and this skate wheel is seated in the guideway. The angle irons forming the guideway for the skate wheel prevent lateral or sideways displacement of the pallet. At various points within the gravity-operated portions of the conveyer are located so-called work stations, where all sides of the piece of furniture being carried on the pallet can be brought before the workman without removal of the pallet from the conveyer. No powered means is provided to move the pallets into, through, and out of the work sta-

3. Plaintiff's witness Tridwell testified:
 "Q. In other words, in those (De-Burgh) conveyers you do not use gravity in any portion of the conveyer, storage or main line? A. That is correct, we do not use gravity to propel the pallets."

tions. The defendants' conveyer system is of considerable length, and in order to give the track sufficient downward slope to give gravity movement to the pallets, short sections of the track at several points on the conveyer line are elevated by means of upward sloping powered ramps or sections, each ramp being independently operated. While moving up and over the powered ramps which elevate the track, the pallets rest upon spaced-apart chains, and move merely through their bottom surfaces bearing on the chains, there being no lugs, pins or abutments on the chains to engage the pallets. Throughout the entire conveyer system there is no mechanism in the guideway to engage the wheel on the bottom of the pallet to push or move it forward. Some of the work stations consist of a section of the track rotatably mounted on a pneumatic lift, whereby the pallet at the work station may be raised above the level of the track and rotated. At other work stations on the conveyer, swivel casters are substituted for the skate wheels to facilitate rotation of the pallets. Other work stations employ raised wheels on each side of the conveyer track upon which the pallets may be rotated and over which they must pass as they travel through the station. In some of the work stations the guideway ends short of the station and in others the guideway passes through the station. In instances where the guideway at the work station has been removed, planks are placed in the trackway to permit the worker to stand on the conveyer or walk over it, and where a pair of planks are so used, they are spaced apart, creating a slot between them to permit the passage of the skate wheel on the bottom of the pallet, the slot functioning as a pallet guide. The pallets or platforms on the defendants' conveyer are entirely independent of each other, and the spacing between them is not fixed or limited, as there is no moving chain, lugs or mechanism in the guideway to limit the spacing. Means is provided at the work stations to check the forward movement of the pallet and hold it in a fixed location during rotation, and for releasing the pallet so that it may be moved forward when work at the station is completed.

 The questions presented for determination by the court are: (1) Is the DeBurgh patent No. 2,317,675 valid, and (2) if valid, are claims 1, 3, 4, and 5 infringed? In considering the question of the validity of the patent here in suit, the court recognizes that decisions in recent cases indicate a clear trend toward a higher standard of invention. See Kawneer Co. v. Pittsburgh Plate Glass Co., D.C., 109 F.Supp. 228, 232, and authorities cited. The plaintiff's patent is presumed to be valid. 35 U.S.C. § 282. However, this presumption of validity is rebuttable, and it may be noted that the defendant cites certain prior art patents and prior public use of the Logan conveyer system, which were not cited and apparently not considered by the examiner. There is no presumption of validity over this prior art which the examiner did not consider. O'Leary v. Liggett Drug Co., 6 Cir., 150 F.2d 656, certiorari denied 326 U.S. 773, 66 S.Ct. 232, 90 L.Ed. 467. Furthermore the fact that the examiner did not mention certain prior art does not raise a presumption that he was aware of it and did not consider it applicable. Himmel Bros. Co. v. Serrick Corporation, 7 Cir., 122 F.2d 740, 745; H. Schindler & Co., Inc., v. C. Saladino & Sons, Inc., 1 Cir., 81 F.2d 649, 651; Robinson Aviation, Inc., v. Barry Corp., D.C., 106 F. Supp. 514, 519. The scope of the patent in suit is limited to the invention described in the claims when read in the light of the specifications and drawings, but the claims limit the boundaries of the patent and may not be enlarged by the specifications. In other words, the specifications may explain, but may not expand or enlarge, the patent claims. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; Hutzler Bros. Co. v. Sales Affiliates, Inc.,

4 Cir., 164. F.2d 260. Furthermore, De-Burgh, the patentee, is presumed to have known and is chargeable with knowledge of everything disclosed by the prior art in the field of conveyer systems and of all devices in that field which have been in prior public use. Zephyr American Corporation v. Bates Mfg. Co., 3 Cir., 128 F.2d 380; Cutler Mail Chute Co. v. Capitol Mail Chute Corporation, 2 Cir., 118 F.2d 63; Detroit Stoker Co. v. Brownell Co., 6 Cir., 89 F.2d 422, 424.

The law has long been established and is restated in the new Patent Act of 1952, 35 U.S.C. § 282, that the burden is upon the defendants to establish their claim of invalidity. Furthermore, that burden must be sustained by clear, satisfactory, and convincing evidence. Crosley Corporation v. Westinghouse Electric & Mfg. Co., 3 Cir., 152 F.2d 895; 2 Walker on Patents, Deller's Ed., § 276, pp. 1272, 1273. However, it has been held that the new Patent Act, 35 U.S.C. § 1 et seq., did not change the tests for determining patentability, and it still remains for the court to determine whether, within the meaning of the statute conferring patent monopoly, there is invention and, therefore, patentability. General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 912, 915 (opinion on rehearing). In the case of Application of O'Keefe, 202 F.2d 767, 771, 40 C.C. P.A., Patents, 879, the court said: "The Patent Act of 1952, * * * which took effect January 1, 1953, has apparently neither raised nor lowered the standard of invention". In Interstate Rubber Products Corp. v. Radiator Specialty Co., 4 Cir., 214 F.2d 546, 549, the court said:

"As stated in the Senate and House Reports during the enactment of the statute by Congress and in recent decisions of the courts, the provisions of § 103 (35 U.S.C. § 103) merely codified the law laid down by the courts during the past hundred years, and were added to the statute for purposes of uniformity and definiteness. See Stanley Works v. Rockwell Mfg. Co., 3 Cir., 203 F.2d

846; General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 912."

The plaintiff's patent in suit is a combination improvement patent comprising an accumulation or aggregation of old parts or elements with some slight changes, modifications or substitutions. To constitute patentable invention an aggregation of old elements or parts must cooperate to produce a new, unobvious, and unexpected result. Application of Bowen, 197 F.2d 553, 39 C.C. P.A., Patents, 1027. If invention is absent, mere utility and novelty are not alone sufficient to sustain the validity of a combination patent. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 150, 152, 71 S.Ct. 127, 129, 95 L.Ed. 162, the Supreme Court said:

"It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. * * *

"The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008: 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' To the same end is Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334, and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. * * *

"Courts should scrutinize combination patent claims with a care pro-

portioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

See also Sinclair & Carroll Co., Inc., v. Interchemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973; General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F. 2d 645, rehearing denied 6 Cir., 203 F.2d 912.

The test of patentability was recently well expressed in Buffalo-Springfield Roller Co. v. Galion Iron Works Mfg. Co., 6 Cir., 1954, 215 F.2d 686, 687:

"The patent law requires not only that the subject-matter of a patent must possess novelty and utility but must also demonstrate an exercise of the inventive faculty. Seymour v. Ford Motor Co., 6 Cir., 44 F.2d 306. The Court of Appeals of the Ninth Circuit has recently in Kwikset Locks, Inc., v. Hillgren, 9 Cir., 210 F.2d 483, 486, put it this way: 'Moreover, a truly inventive combination must create what had not before existed or bring to light what lay hidden from vision in a way which can be distinguished from "simple mechanical skill." A mere advance in efficiency and utility is not enough to convert a noninvent-

ive aggregation into a patentable combination.' "

In Interstate Rubber Products Corp. v. Radiator Specialty Co., 4 Cir., 214 F. 2d 546, 548, the court said:

"It is quite impossible to define patentability except in the most general terms. It cannot be denied merely on the ground of the simplicity of a discovery, as appears in the classic example of the Eibel patent, Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; see also Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; but it does not come into being merely because the device is novel and represents an interesting and useful improvement. The touchstone is whether the new thing is beyond the ability of the worker of ordinary skill in the field, and neither the courts nor Congress have been able to offer a more definite test, so that in the end it must be left to the judgment of the courts in controverted cases to apply the formula to the specific facts; and the judges may not endow with the quality of invention every new and useful advance amidst the myriad activities of a resourceful people."

This court said in Spring-Air Co. v. Ragains, D.C., 96 F.Supp. 79, 82:

"A device or structure, to be patentable, must be more than new and useful; it must satisfy the requirements of invention or discovery and must represent more ingenuity than the work of a mechanic skilled in the art. (Authorities cited.) An extended application of prior-art teachings, mere perfection of workmanship, a change only in size, form, strength, proportions, degree, or the substitution of equivalents doing substantially the same thing by substantially the same means, does not amount to patentable invention. (Authorities cited.) In Sinclair & Carroll Co. Inc., v. Interchemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143,

1145, 89 L.Ed. 1644, the court said: 'A long line of cases has held it to be an essential requirement for the validity of a patent that the subject-matter display "invention", "more ingenuity * * * than the work of a mechanic skilled in the art." * * * This test is often difficult to apply; but its purpose is clear. Under this test, some substantial innovation is necessary, an innovation for which society is truly indebted to the efforts of the patentee.' "

■ The improvement of one element in a combination of old elements does not entitle a patentee to a monopoly on the entire combination. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Bassick Manufacturing Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251; 1 Walker on Patents, Deller's Ed., § 41, pp. 211–218. Furthermore, an improvement to be patentable must not only be new and useful but must involve invention. 35 U.S.C. § 101; Cole v. Hughes Tool Co., 10 Cir., 1954, 215 F.2d 924. Minor differences in design and construction of a patented device over the prior art, involving no new principle and accomplishing nothing more than what one skilled in the art could readily discern do not amount to invention. H. W. Gossard Co. v. Loeber's, Inc., 7 Cir., 114 F.2d 166, certiorari denied 312 U.S. 680, 61 S.Ct. 450, 85 L.Ed. 1119. Minor or trivial modification of a device does not show invention. Benjamin Electric Mfg. Co. v. Bright Light Reflector Co., Inc., 7 Cir., 111 F.2d 880. Transposition, reallocation or integration of old elements or parts does not amount to invention. Application of Lockhart, 190 F.2d 208, 210, 38 C.C.P.A., Patents, 1195; General Machinery Corporation v. Clearing Mach. Corporation, 7 Cir., 104 F.2d 553, 556; Robinson Aviation, Inc., v. Barry Corp., D.C., 106 F.Supp. 514, 518, 519. The mere carrying forward or extended application of an earlier idea or conception of another, involving a change

only in form, proportion or degree, where the same work is performed in substantially the same way by substantially the same means, although with better results, is not invention. Cole v. Hughes Tool Co., supra, 10 Cir., 215 F.2d 924. The mere advance in efficiency and utility is not sufficient to convert a noninventive aggregation of old elements and parts into a patentable combination. Buffalo-Springfield Roller Co. v. Galion Iron Works, supra, 6 Cir., 215 F.2d 686.

■ The plaintiff's patent here in suit claims a combination for an improvement in the field of conveyer systems. This is a crowded art, as conveyer systems have long been in common use in factories, mercantile establishments, and elsewhere for the convenient and economical movement of articles in the process of manufacture and in the process of packaging, storage, and sale. In considering combination claims for an improvement in a crowded art, the court said in Shaffer v. Armer, 10 Cir., 184 F. 2d 303, 307:

"To make sure that a monopoly is not granted for mere perfection of workmanship, the courts closely scrutinize claims to combinations for improvements in a crowded art. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 10, 67 S.Ct. 6, 91 L.Ed. 3."

See also Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Kobe, Inc., v. Dempsey Pump Co., 10 Cir., 198 F.2d 416; Hollywood-Maxwell Co. v. Street's of Tulsa, 10 Cir., 183 F.2d 261.

Application for the patent in suit was filed October 16, 1939, and the patent was issued April 27, 1943. It is significant that in the course of the prosecution of this application many claims and amendments thereof, embodying old parts and elements included in the combination improvement patent ultimately issued, were rejected by the examiner, and that on review of his action as to certain claims, the board of appeals affirmed the examiner's rejection of claims

2 and 18 as amended. Claim 2 as amended and as rejected by the examiner and the board of appeals provided:

"In a system of the character described, a trackway leading through a succession of work stations, a pallet guideway extending along the trackway, and having a longitudinal slot, a conveyer belt mounted for travel in the guideway and having abutments at spaced intervals therealong, a plurality of work mounting pallets removably mounted on the trackway for support and travel therealong, studs on the pallets extended into the guideway slot for engagement by the belt abutments for effecting the advancement of the pallets along the trackway and free for movement along the belt between successive abutments, and whereby the pallets are normally retained against lateral displacement from the trackway."

The above amended claim 2 of the application was finally rejected on the basis of prior art patents Rebstock 1,505,971, Francis 1,792,533, Baker 1,831,283, and Dahms 1,889,274. It may also be noted that claim 18 of the application, as amended, which was rejected by the examiner and by the board of appeals on the basis of Knight 1,540,021, read as follows:

"In combination, a conveyer means leading through a work station, a work mounting pallet associated with the conveyer means for travel therealong, and means incorporated in the conveyer means at the work station for the rotatable support of the pallet."

In support of their claim of invalidity the defendants refer to the so-called Logan conveyer, which was installed and operated in the plant of the Direct Action Stove division of the American Stove Company many years ago. Patentee DeBurgh is presumed to have had knowledge of the elements, design, and operation of this conveyer. The Logan conveyer consisted of a conveyer track, with wheel-like means consisting of rollers, supporting platforms such as crate bottoms, which moved along the conveyer; a continuously moving, power-driven chain traveling in a central slot extended the length of the conveyer; lugs on the chain spaced apart a distance substantially greater than the length of the platforms or crate bottoms, bore against the platforms or crate bottoms to push them along the conveyer. At spaced intervals on the conveyer there were so-called ball-bearing transfer plates, which might properly be called work stations, on which the platforms or crate bottoms could be rotated freely without removal from the conveyer. The crate bottoms or work-supporting platforms carrying stoves or other articles, could be passed over the ball-bearing transfer plates or work stations, or could be stopped in the station for a period dependent upon the speed of the conveyer chain and the spacing of the lugs or platform-engaging elements on the conveyer chain. As the speed of the traveling chain and the spacing of the lugs on the chain determined the speed of the crate bottoms or work platforms, the Logan conveyer could properly be referred to as a timed conveyer. Connecting with the conveyer were auxiliary or receiving lines, and crate bottoms or boxes as work-mounting supports could be transferred to or from the main line of the conveyer without manual or mechanical lifting of the work supports. The crate bottoms or other work-carrying means on the Logan conveyer illustrated, were comparable to, and served the same purpose as, the so-called work pallets on the DeBurgh conveyer in suit. It may be noted that the specifications of the DeBurgh patent stated that the pallets might be circular, square, hexagonal, oblong, or any other suitable shape. The lugs on the moving chain in the Logan conveyer moved the crate bottoms along the line and illustrated and accomplished the same transportation result as the lugs on the moving belt and the pins on the bottom of the pallets in DeBurgh. The lugs on the conveyer belt in the central guideway of DeBurgh, cooperating with the centrally located pins on the

pallets, kept the pallets from sideways displacement on the conveyer. This particular element to prevent sideways displacement was absent from the Logan system but is fully illustrated by Hogg 519,630, Hutton 1,448,119, Rebstock 1,505,971, and Prince 1,716,664. Furthermore, the file wrapper history of DeBurgh shows that the idea of a stud or pin on the bottom of the pallets to serve as an axis about which the pallet is rotated, was rejected as not constituting invention. The ball-bearing transfer plates on the Logan conveyer provided for free and easy rotation of the work-carrying crate bottoms and illustrated and served the same purpose as the swivel casters at the work stations in DeBurgh. At this point it should be noted that the specifications of DeBurgh provided that as an alternative for the caster supports at the work stations, ball bearings or any other form of support which would not interfere with the free and easy advancement and rotation of the pallets, might be employed. It would seem that the Logan conveyer illustrated the ideas embodied in DeBurgh, except that the crate bottoms or work-carrying platforms of Logan did not have a pin on the bottom connecting with the lug on the moving chain to prevent sideways displacement. However, this particular element was fully disclosed in the prior art cited above, and there was testimony in the present case indicating that the crate bottoms moved along the Logan conveyer without displacement. The catalogs of the Mathews Conveyer Company published in 1930 and 1936, which were put in evidence, illustrate many of the elements and parts of the DeBurgh conveyer, and it may be noted that neither the Mathews illustrations nor the Logan conveyer was cited or considered by the patent examiner.

The use of casters for rotation of the pallet or work-carrying platform in DeBurgh is also illustrated by Fitzhenry 76,619 (not cited by the examiner), which shows the use of swivel casters to facilitate the rotation of a so-called tablet or work table, which tablet or work table served the same work-carrying purpose as the pallet in DeBurgh. The caster wheels in Fitzhenry were revolvable on their own axes and in a circular path about the axes of their spindles, and that patent states that the casters are mechanical equivalents of ball bearings.

Dahms 1,889,274 (cited by the examiner) illustrates a conveyer for the movement of articles of furniture in the process of manufacture. It describes a furniture conveyer consisting of guide tracks on which rides a movable car with supporting frame to carry an article of furniture being moved; an endless, power-driven chain for propelling the movable car; guides for the chain between the tracks; an engaging member on the driving chain to engage and propel the movable car or to disengage the car. The movable car with its supporting frame for the carrying of an article of furniture and the engaging member on the chain illustrate and serve the same purpose as the pallet and the lugs on the moving belt in DeBurgh.

Francis 1,792,533 (cited by the examiner) relates to conveyers particularly adapted for use in automobile-body factories for the movement of bodies in the process of manufacture. It provides, among other things, for a caster-supported carriage propelled by a power-driven chain in a guideway fixed to the floor, with sprocket wheels rotatably mounted on vertical axes at the points where the direction of the guideway changes. The carriage comprises a platform mounted on swivel casters; spaced-apart pins or spurs project upwardly from the chain to engage receiving means on the carriage to propel and guide the same, and with means for automatically engaging and disengaging the carriage from the chain. Francis illustrates in reverse DeBurgh's idea of a downwardly projecting pin on each pallet to engage the lugs on the power-driven belt, whereby the pallet is guided and propelled along the trackway. In his rejection of claim 2 as amended, the examiner said: "A reversal of the positions of pin 3 and abutment 18 (fig. 5)

of Francis would be suggested to anyone skilled in the art by the Dahms disclosure."

In his brief plaintiff's counsel attempts to depreciate the importance of Hogg 519,630 (cited by the examiner) as a prior art patent because of its antiquity. However, it is significant that the rather simple device described in Hogg, patented a half century ago, illustrates most of the elements or parts in the DeBurgh combination for which plaintiff is seeking a patent monopoly. Hogg relates to a conveyer device for automatically serving foods and beverages on tables and counters, but the elements, parts, and ideas illustrated in that patent would be equally adaptable to a conveyer system for carrying articles of furniture in the process of manufacture. This patent was cited as a reference by the examiner in rejecting the original claims of the DeBurgh application. Hogg illustrates a conveyer having a trackway with a power-driven endless chain located in a slot, and with rollers or wheels carrying circular and rotatable trays, the trays being provided with centrally located pendent bolts extending into the slot and removably journaled in vertical sleeves on the chain. Hogg illustrates substantially the same means as DeBurgh for removably connecting the carrying trays or pallets to a moving chain and for permitting the carrying trays or pallets to be rotated without removal from the conveyer. The tray in Hogg is the mechanical equivalent of DeBurgh's pallet, and Hogg teaches the use of a central pin on the tray or pallet for rotatable connection with the moving chain, without permanent, fixed attachment between the pin and chain.

Rebstock 1,505,971 (cited by the examiner) illustrates a conveyer comprising spaced-apart side rails and guide members; rollers operating between said side rails; a chain running between the guide members; a platform or device resting on said rollers supporting articles being carried; and a means for connecting the article-supporting device and the moving chain.

Prince 1,716,664 (not cited by the examiner) illustrates a conveyer having a power-driven chain and a means for connecting the bottom board of the article-carrying part with the moving belt, such means comprising a pivotal projection on the bottom board and a rigid projection on the links of the moving belt.

Hutton 1,448,119 (not cited by the examiner) illustrates a trackway, a guideway, and a power-driven cable to propel a railroad coal car, with an upwardly projecting part on the cable to engage a plate or flange extending downwardly from the car.

Discussion of other prior art cited in support of defendants' contentions would only be cumulative and is unnecessary. The generic art involved in this suit is the art of conveying articles, such as pieces of furniture, through a factory in the process of manufacture. In Buffalo-Springfield Roller Co. v. Galion Iron Works Mfg. Co., supra, 6 Cir., 215 F.2d 688, Chief Judge Simons said:

"It is settled law beyond the need of citation that the adaptation of a machine for a new use does not entitle one to a patent if the idea of the new use is suggested by analogous art and invention may not be perceived in the adaptation. * * * In an age of specialization it cannot be true that every differentiation from known art closes the door to its teachings and, so, entitles the adapter to a monopoly on the ground that what he has done is a new thing merely because the old instrumentality has been used for a different purpose.

"Long ago, we came to the view in Dunham Co. v. Cobb, 6 Cir., 19 F.2d 328, that where a specialized art is merely the offspring of a more generic art it is entitled, by right of descent, to the previously disclosed useful characteristic of the ancestral estate, and we have followed and applied this concept in numerous cases".

In Mathews Conveyer Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 89, the court said:

"An old mechanism fully capable of a use not then observed, anticipates a later patent for the application of that means to the new use. Patentability cannot rest on the observation in a given device of a usefulness not before noticed; and the fact that a party did not in fact use his mechanism for a particular purpose, or even that he did not foresee that such purpose would be a useful one, is not material. William B. Mershon & Co. v. Bay City Box & Lumber Co., C.C.Mich., 189 F. 741. Discovery of new uses for, or newly observed functions of a device, well known in the mechanical or structural arts, is not patentable invention; Grand Rapids Refrigerator Co. v. Stevens, 6 Cir., 27 F.2d 243; and the use for which an apparatus was intended is irrelevant, if it could be employed without change for the purposes of the patent. Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823."

The DeBurgh patent in suit is a combination for an improvement in the method of utilizing factory conveyers, and combinations for improvements in a crowded art should be closely scrutinized. This patent combines an aggregation of old elements and parts from the prior art and from conveyers in prior use, with some minor unpatentable modifications or variations in construction and function. These minor improvements in construction and function do not constitute invention. Similar results, although possibly not as satisfactory, have been accomplished in the prior art and in conveyers in prior use. The form and arrangement of the elements and parts in a factory conveyer system are merely matters of choice of the engineer or skilled mechanic constructing the system to meet the particular needs of a factory. Lundell v. Wallin Mfg. Co., D.C., 1954,

122 F.Supp. 484. The patent in suit makes no substantial change in the mechanical features illustrated in the prior art and in conveyers in prior use. It is clear that a mechanic skilled in the conveyer art, and with the prior art, the Logan conveyer, and the printed publications before him, could have created the conveyers method or mechanism described in DeBurgh. That is, the claimed invention would have been obvious at the time of its conception to a mechanic having ordinary skill in the conveyer art. 35 U.S.C. § 103. The plaintiff is claiming an aggregation of old elements or parts with some slight improvement in function, as a patent monopoly. The court is convinced that the patent adds little, if anything, to the total stock of knowledge in the field of conveyer systems, and does not constitute invention.

 The DeBurgh conveyer may have obtained some commercial success, but in the absence of invention, any commercial use or success it may have achieved will not create patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162.

 The conveyer system described in the DeBurgh patent in suit is simple, and the question as to its patentability is plain. From examination of the file wrapper, and from examination of the prior art, including the Logan conveyer and printed publications, and from objective study of the plaintiff's conveyer system, the court concludes that all claims of the plaintiff's patent in suit are invalid because of prior art anticipation and lack of invention. The question of infringement does not require consideration, as an invalid patent cannot be infringed.

Judgment will be entered dismissing the plaintiff's original complaint filed June 30, 1950, and determining that all claims of the DeBurgh patent in suit are invalid. The defendant is entitled to recover court costs but not costs of suit.