R. B. SNOWDEN v. FRANK L. SORENSEN, d.b.a. SOLAR PRODUCTS COMPANY, LTD., AND OTHERS. JOHN L. LENIHAN AND ANOTHER, APPELLANTS.[1]

March 16, 1956.

Nos. 36,668, 36,669.

[1]Reported in 75 N. W. (2d) 795.

*Johnson, Sands & Brumfield* and *Maurice C. Lizee,* for appellants.
*George P. Hoke, Charles A. Bassford,* and *Richards, Janes, Hoke, Montgomery & Cobb,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action by R. B. Snowden against defendant Frank L. Sorensen, doing business as Solar Products Company, Ltd., a trade name, for breach of a contract; and against defendants John L. Lenihan and Pharmakon, Inc., a Minnesota corporation, for inducing defendant Sorensen to bring about such breach in making impossible his performance of such contract.

At the close of plaintiff's testimony, the motions of defendants Lenihan and Pharmakon, Inc., for directed verdicts were denied; and thereupon all defendants rested. The trial court then directed verdicts in favor of plaintiff and against defendant Sorensen, and the jury returned verdicts against both other defendants, each in the sum of $4,483.58. These are appeals by defendants Lenihan and Pharmakon from the judgments entered pursuant to the verdicts after orders denying their respective motions to set aside such verdicts and to order judgments in their favor.

The contract involved was dated April 24, 1952, and provided that defendant Frank L. Sorensen, *d.b.a.* Solar Products Company, Ltd., was to deliver to plaintiff by May 17, 1952, machinery and equipment for the extraction of crude chlorophyll from alfalfa crops produced on plaintiff's plantation near Hughes, Arkansas. At the time of the execution of the contract, plaintiff paid to Sorensen the sum of $4,000 "as a downpayment" thereon, and Sorensen agreed to travel to plaintiff's place in Arkansas to supervise installation of the equipment which was then being manufactured by Sorensen under certain patent rights.

The contract required that all costs for the construction and installation of such equipment be paid by plaintiff and charged to Sorensen; that plaintiff have the option of purchasing such equipment at its cost, plus $5,000 to be paid Sorensen for services rendered in supervising its manufacture and installation; and that, if such option were not exercised, plaintiff have the right to keep the plant at its cost on his books, or in the alternative surrender it to Sorensen who would then be obligated to repay all sums advanced by plaintiff in its construction and installation.

The contract also provided that such crude chlorophyll as plaintiff produced thereunder would be dried in tunnels which plaintiff was to construct and which he did later construct at a cost of $452 and that thereafter the dried crude chlorophyll would be shipped to Sorensen in Minneapolis, who would pay plaintiff therefor at certain specified rates per pound dependent upon the percentage concentration of such crude chlorophyll. It also gave plaintiff rights

for the sale of similar installations in certain states mentioned in the agreement.

Prior to this contract, Sorensen had been in contact with defendant John L. Lenihan, seeking to induce him to take over the process of refining crude chlorophyll in Minnesota, it being Sorensen's plan to install machines similar to that covered by plaintiff's contract in other localities to serve as a source of supply for such crude chlorophyll to be refined here. Lenihan manifested interest in the proposition, and on May 2, 1952, conferred with Sorensen with respect to the construction of such a refining plant in Minnesota. At that time nothing was mentioned by Sorensen about the contract with plaintiff other than that Sorensen already had arranged sources for the supply of the crude product. After May 7, 1952, Lenihan caused Pharmakon, Inc., to be organized as a Minnesota corporation and became its president. On May 12, 1952, another conference was held between Sorensen and Lenihan as an official of Pharmakon, Inc., as a result of which a contract was executed between them which provided:

"Pharmakon, Inc., a Minnesota corporation, has been organized for the purpose of aiding and assisting Sorensen * * * to finance and construct the machines and systems used for such purpose and for the rental, sale or other disposition of such machines, the purchase of the product to be refined and the refinement and sale of the product through the operation of a central refining and processing plant.

* * * * *

"Franklin L. Sorensen, Sr., in consideration of the assumption by Pharmakon, Inc., of certain obligations necessary in the development and marketing of said prospective invention or inventions, * * * does hereby sell, transfer, convey and assign to Pharmakon, Inc., all of his inventions and improvements in articles, apparatus, processes and compositions relating to or connected with chlorophyll derivatives extracted from alfalfa * * * and * * * all of his right, title and interest in and to all such inventions and im-

provements and in and to any letters patent and applications for letters patent thereon * * *."

It was not until after execution of this contract on May 12, 1952, that Sorensen disclosed to Lenihan the previous contract with plaintiff. On May 15, 1952, Sorensen, accompanied by Lenihan, traveled to Memphis, Tennessee, for an interview with plaintiff. Sorensen was then cognizant that, because of mechanical difficulties in connection with the construction of the machine sold to plaintiff, and because of lack of funds to finance the purchase of the crude chlorophyll, he would be unable to perform his agreement with plaintiff. At the Memphis meeting he so advised plaintiff, and Lenihan, acting for Pharmakon, Inc., thereupon offered plaintiff a substitute agreement, whereunder plaintiff would be refunded the $4,000 previously paid to Sorensen, and a machine and equipment identical to that purchased from Sorensen would be leased to him. This proposal was rejected by plaintiff and Lenihan and Sorensen then returned to Minneapolis. With reference to this conversation, plaintiff testified as follows:

"Q. He explained to you that that corporation had been formed *to take over the refining of chlorophyll,* didn't he?

"A. I think so, yes." (Italics supplied.)

"A. * * * they were going to have to build machines like the Sorensen machine to give to other people so they would get a supply."

"A. Mr. Lenihan stated that he would like me to give up my contract and that he had a new contract and a deal with Mr. Sorensen and they were going to do things on a different way; * * * and were to take that machinery and rent it to me, on a new deal, and the new deal they offered was not satisfactory and I stated simply that I already had a contract and that 'I am perfectly willing to cooperate if I can with you and see if I can fit into your new deal but I certainly can't on the contract you have offered me and I just stand on my ground * * *.' "

Subsequently, about June 10, 1952, plaintiff traveled to Minneapolis and discussed further the lease agreement proposed as a

substitute for his purchase contract but was unable to reach an agreement with Pharmakon, Inc. He testified that on the occasion of that visit he had learned that the machine which Sorensen was constructing under his contract would not work.

With reference to its inability to perform, Sorensen testified:

"I loaned the machine to Pharmakon [in Wisconsin] figuring that I would get a chance to try out and see if the machine was operating all right."

"Q. Was the machine working satisfactorily?

"A. No, we were having a lot of trouble.

"Q. What type of trouble?

"A. Well, the upper wooden rolls, corrugated rolls, gave us some trouble first. * * * Then after that * * * we had trouble with the large rolls. We first padded a roll * * * and were having trouble with the wrapping. Then after we eliminated the wrapping we put welded beads upon these two large compression rolls and it started off and ran a little while and then we got slugs in the upper end, corrugated rolls, and then the assembly broke, * * * we had to change our hopper on it, and then we welded some beads * * * for a little bit more of a tearing action and loaded the upper roll. It was a hollow cylinder and we loaded it with water to create more compression, and then we had trouble following that with the conveyor * * * that was receiving the stuff, and * * * also * * * the outlet on the juice, we were having trouble with that * * * coming through with the juice, and also a re-absorption in some of the vineage of the juice, so we didn't get hardly any juice.

*     *     *     *     *

"Q. And what was done with the machine at the conclusion of July over there in Wisconsin?

"A. It was brought back to Minneapolis.

"Q. Was it dismantled?

"A. Right.

"Q. Where was it brought back to in Minneapolis?

"A. The machine shop where it was made.

"Q. And has it remained there ever since?

"A.  It is there now."

On appeal the defendants Lenihan and Pharmakon, Inc., contend that the evidence as above outlined is insufficient to support a finding that any actions on their part caused or induced Sorensen to breach the contract with plaintiff.

■ The elements essential for recovery of damages for inducing breach of contract are (1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom. Royal Realty Co. v. Levin, 244 Minn. 288, 292, 69 N. W. (2d) 667, 671; Sorenson v. Chevrolet Motor Co. 171 Minn. 260, 214 N. W. 754, 84 A. L. R. 35.

■ In the instant case we cannot escape the conclusion that plaintiff failed to establish several of such essential elements. The record is barren of evidence from which an inference may be drawn that either of the defendants Lenihan or Pharmakon, Inc., were aware that Sorensen had previously entered into an agreement with plaintiff. On the contrary, there is the positive testimony of Sorensen that this was not disclosed to Lenihan or any officials of Pharmakon, Inc., until after the contract between Sorensen and Pharmakon, Inc., had been executed. Sorensen's main objective in dealing with Lenihan was the establishment of a refining plant to which plaintiff and others might forward the crude chlorophyll for refining. It is clear from the testimony that Sorensen saw nothing inconsistent in his contractual relationships with plaintiff for the producing of crude chlorophyll and with Pharmakon, Inc., for the refining of this product and for that reason did not deem it essential to disclose plaintiff's contract to either Lenihan or Pharmakon, Inc. This conclusion finds support in the provisions of Pharmakon, Inc.'s contract as above set forth wherein Sorensen assigned only his "inventions and improvements in articles, apparatus, processes and compositions relating to or connected with chlorophyll derivatives extracted from alfalfa or other plants," and wherein there is nothing making it impossible for Sorensen to perform his contract with plaintiff.

■ But even assuming that defendants Lenihan or Pharmakon, Inc., were aware of the prior contract, there is still no evidence to support a finding that any acts of either of them brought about its breach by Sorensen. The mere fact that they knew of the first contract would be no bar to either of them entering into a second contract with Sorensen, providing they did nothing to induce Sorensen to breach the prior contract. Minnesota Wheat Growers Co-op. M. Assn. v. Radke, 163 Minn. 403, 204 N. W. 314; Royal Realty Co. v. Levin, *supra;* Sweeney v. Smith (E. D. Pa.) 167 F. 385, affirmed (3 Cir.) 171 F. 645; Prosser, Torts, § 104, p. 986. As above suggested, there is nothing in the later contract here which is inconsistent with the prior one or which prevented Sorensen from performing its terms. Beyond this, the only action complained of was Lenihan's suggestion, rejected by plaintiff, that Pharmakon, Inc., would finance a new and different arrangement with plaintiff under a rental agreement and would refund to plaintiff his expenditure under the original purchase contract. When plaintiff rejected this proposal, Lenihan returned to Minnesota, and there is nothing in the record which would support a finding that either he or Pharmakon, Inc., did anything thereafter to induce Sorensen to break with plaintiff. On the contrary, Pharmakon, Inc., which was controlled by Lenihan, at a considerable outlay of funds established a refining plant which might have made it possible for Sorensen to perform the prior contract with plaintiff had the machine sold thereunder been able to perform satisfactorily.

■ The record contains substantial evidence that Sorensen alone was responsible for the breach with plaintiff. He testified that he advised plaintiff he would be unable to perform this contract. The machine sold to plaintiff, as finally assembled by Sorensen, was defective and incapable of producing the crude chlorophyll in commercial quantities under Sorensen's patented processes. After its month-long tryout in Wisconsin, it was found to be defective and was shipped to Minneapolis and dismantled. Sorensen abandoned any thought that it could ever be made effective and concluded that only through entirely different processes could the crude chlorophyll

be extracted from the alfalfa in quantities. About this time he became insolvent and from a financial viewpoint incapable of ever fulfilling the contract with plaintiff. There is nothing to indicate that these conditions were brought about by either Lenihan or Pharmakon, Inc., or that they had anything to do with them. It is clear that Sorensen alone was responsible for failure to perform his contract with plaintiff.

■ Finally, there is an absence of any evidence to establish that plaintiff suffered damages because of the actions of either defendant Lenihan or defendant Pharmakon, Inc. As above indicated, the machine which Sorensen had agreed to furnish plaintiff was defective and could never be made effective from a commercial viewpoint. Even if working properly, it was incapable of producing crude chlorophyll in sufficient quantities to make its operation worth while. The patented processes, which Sorensen hoped might be utilized through the machine, had been abandoned, and had the machine been shipped to plaintiff, his damages would have substantially increased. Failure to establish damages in itself would entitle these defendants to judgment in their favor. Royal Realty Co. v. Levin, 244 Minn. 288, 69 N. W. (2d) 667; Johnson v. Gustafson, 201 Minn. 629, 277 N. W. 252; Sorenson v. Chevrolet Motor Co. 171 Minn. 260, 214 N. W. 754, 84 A. L. R. 35.

The judgments appealed from are reversed.

Reversed.