SPAN–DECK, INC., a Tennessee
corporation, Appellee,

v.

FAB–CON, INCORPORATED, a Minneso-
ta corporation; and Rauenhorst Corpo-
ration, a Minnesota corporation, Appel-
lants.

No. 81–1829.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 14, 1982.

Decided May 12, 1982.

Rehearing and Rehearing En Banc
Denied June 7, 1982.

Schroeder, Siegfried, Ryan, Vidas, Steffey & Arrett, P.A., Robert O. Vidas, Charles E. Steffey, Faegre & Benson, John D. French, Lawrence C. Brown, John D. Shively, Minneapolis, Minn., for appellants Fabcon, Inc. and Rauenhorst Corp.

Dorsey, Windhorst, Hannaford, Whitney & Halladay, John M. Mason, Stuart R. Hemphill, Minneapolis, Minn., for appellee Span-Deck, Inc.

Before LAY, Chief Judge, ARNOLD, Circuit Judge, and WOODS,* District Judge.

LAY, Chief Judge.

Span-Deck, Inc. (Span-Deck) brought this action against Fabcon, Incorporated (Fabcon) and Rauenhorst Corporation (Rauenhorst) to recover royalties and to enjoin the use of equipment, trade secrets, know-how, and patent and trademark rights relating to a manufacturing process for prestressed precast concrete. Following a lengthy and involved jury trial, judgment was entered for Span-Deck upholding the validity of the patents in question and awarding $1,500,000 compensatory damages against Fabcon for breach of the franchise licensing agreement and $2,000,000 punitive damages against Rauenhorst for tortious inducement of breach of contract. The judgment was subsequently amended to hold Rauenhorst jointly and severally liable for the $1,500,-000 compensatory damage award. Fabcon and Rauenhorst now appeal primarily on the grounds that the two patents involved are invalid as a matter of law, thereby justifying Fabcon's discontinuation of royalty payments under the *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), doctrine.

*Facts.*

Span-Deck is a Tennessee corporation engaged in franchising the use of its equipment and process for the large-volume manufacture of prestressed, precast, hollow-core, structural concrete planks. Span-Deck acquired the "Kinnard patent," United States Patent No. 3,217,375, in 1965 for a casting apparatus and method for production of prestressed hollow-core plank in which a moving casting machine deposits liquid concrete around lightweight granular cores in slipforms on a fixed bed to surround tensioned steel cables. A second pat-

---

* Henry Woods, United States District Judge, Eastern District of Arkansas, sitting by desig-

nation.

ent, the "Mitchell patent," United States Patent No. 3,523,343, was obtained by Span-Deck in August 1970 for a system which incorporated the Kinnard machine into a centralized, large-volume plank production system utilizing large, moving casting beds. Span-Deck licensed numerous operations in both the United States and foreign countries for the franchised use of its system of moving and controlling a large casting bed in coordination with casting and curing equipment. Rauenhorst, a large Minneapolis-based general construction company, entered into negotiations with Span-Deck in the summer of 1970 with the intention of entering the precast concrete business. Fabcon, a wholly-owned subsidiary of Rauenhorst formed specifically for the concrete plank manufacturing operation, entered into a franchise license agreement with Span-Deck in October 1970. In the agreement Span-Deck agreed: to supply casting equipment and standard detail drawings; to render "reasonable assistance . . . experience and knowledge, its know-how and trade secrets regarding the manufacture and use of" the Span-Deck products; to grant the exclusive right for five years to the Kinnard and Mitchell patents in a stated territory; and to grant the exclusive right to the "Span-Deck" and "Insulcore" trademarks for the duration of the contract. In return Fabcon agreed to pay $225,300 for the machinery and equipment, plus continuing royalties during the effective period of the franchise agreement. Finally, the agreement included options for Fabcon to extend the contract term an additional five years and to avoid royalties in the event a final judgment should be entered in a court of competent jurisdiction determining that Span-Deck's machine or processes are not protected by patents. The agreement contained the following post-termination requirements:

4.4 In the event of termination of this Agreement in any manner, LICENSEE shall have the right to complete any and all contracts which it may be obligated to fulfill, paying the royalties thereon, but it shall not further use, either directly or indirectly, the trade-marks or trade names, any trade secrets or valid, protected patented processes of LICENSOR, or use or employ any imitations of LICENSOR'S trade names, trade-marks, or valid, protected patented processes, if acquired during the term of this Agreement; and these obligations shall continue after termination of this Agreement.

Fabcon commenced production under the franchise agreement in July 1971, and soon expanded its operation by doubling its casting bed capacity from August 1972 to February 1973. Meanwhile, Rauenhorst offered to purchase Span-Deck for over $2,000,000, and Fabcon attempted to hire one of Span-Deck's experienced engineers as its production manager; both efforts proved unsuccessful. In February 1973 Fabcon ceased making royalty payments, allegedly because it claimed entitlement to a credit under a "most-favored-licensee" provision. In April 1973, Rauenhorst asserted that Span-Deck's patents were either invalid or not infringed and unsuccessfully urged termination of the franchise agreement.

Span-Deck commenced this action against both Fabcon and Rauenhorst in November 1973. Count I of Span-Deck's complaint alleges breach of contract by Fabcon and seeks payment of royalties and injunctive relief. Count II alleges intentional inducement of breach by Rauenhorst and seeks compensatory and exemplary damages. Count III alleges unauthorized use of trade secrets and know-how and seeks compensatory and exemplary damages and injunctive relief. Counts IV and V allege trademark infringement and seek compensatory and exemplary damages and injunctive relief. Counts VI and VII allege patent infringement and seek compensatory and exemplary damages and injunctive relief.

Fabcon counterclaimed for a declaratory judgment that the franchise agreement was invalid or unenforceable due to failure of consideration and that the Kinnard and Mitchell patents were invalid, unenforceable and uninfringed.

Partial summary judgment was entered for the defendants on that portion of count III regarding alleged misappropriation of "know-how." The trademark infringement

claims of counts IV and V were withdrawn prior to submission of the case to the jury.

The jury answered 22 special verdict questions, and returned a verdict of $1,500,000 in compensatory damages and $2,000,000 in punitive damages against Fabcon and Rauenhorst, respectively, on counts I and II, respectively. Judgment was entered on the verdict, no injunctive relief was granted, and the counterclaim was dismissed with prejudice. The judgment was later modified pursuant to Span-Deck's motion to reflect joint and several liability of Rauenhorst for the $1,500,000 compensatory damages award.

Fabcon and Rauenhorst now appeal, contending that the trial court erred in failing to direct the verdict for Rauenhorst on the tortious inducement claim because Rauenhorst's actions were justified. They contest the extent of compensatory damages. Appellants assert also that there was error in modification of the, compensatory damages part of the judgment because the jury did not find Rauenhorst to be the "alter ego" of Fabcon. Finally, both Fabcon and Rauenhorst urge that the patents in question are invalid as a matter of law.

We vacate the judgment and reverse and remand for further proceedings.

## I. *Patent Validity.*

In *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Su-

preme Court held that a patent licensee is not estopped from challenging the validity of the patent and that he is entitled to avoid payment of all royalties accruing after the patent issued once either he or a third party proves the patent invalid. 395 U.S. at 668–74, 89 S.Ct. at 1910–13.

Fabcon and Rauenhorst urge that the Kinnard and Mitchell patents which lie at the core of the franchise license agreement are invalid as a matter of law, thus precluding compensatory damages for breach of contract under the *Lear* doctrine. Rauenhorst further asserts that Fabcon's discontinuation of royalty payments was justified under *Lear*; and therefore, Rauenhorst could not have tortiously induced Fabcon to breach as a matter of law.

### A. *Kinnard Patent No. 3,217,375.*

■ Appellants contend that the Kinnard patent is invalid pursuant to 35 U.S.C. § 102(b) [1] because the Kinnard invention was in public use or on sale more than one year prior to filing of the patent application.[2] The jury found as to all seven questioned claims of the patent that it had not been in public use for more than one year prior to its application.[3]

■ The jury's verdict fails to specify what the patent application filing date was or whether or not the invention was found to have ever been "on sale" within the meaning of the statute.[4] However, because there is substantial evidence as to both fac-

1. 35 U.S.C.S. § 102(b) provides:

 A person shall be entitled to a patent unless—

 . . . .

 (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . . .

2. The district court found that the rolling-bed casting equipment used by Fabcon does not infringe the Kinnard patent as a matter of law. Neither party appeals from this decision. Thus, on appeal, the issue of validity of the Kinnard patent is relevant to the breach of contract claims only, not to the patent infringement claims.

3. A defendant relying upon the "public use or sale" defense of 35 U.S.C. § 102(b) must prove

the defense by clear and convincing evidence. *CTS Corp. v. Piher International Corp.*, 593 F.2d 777, 779 (7th Cir.), *cert. denied*, 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 113 (1979); *Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corp.*, 316 F.2d 459, 462 n.7 (9th Cir.), *cert. denied*, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143 (1963).

4. One cannot determine from the verdict whether the Kinnard invention was found to have been "on sale," but within a year of the patent application filing date, or whether the alleged use was found to have been experimental, not public. The Kinnard patent was the result of three applications, the first of which was filed in August 1960. The alleged public use or sale occurred on May 11, 1961; the third and only successful Kinnard patent application was filed on July 6, 1962. The successful application claims to be a "continuation-in-part" ap-

tual theories which might support the verdict, the verdict must be upheld, *see Baumler v. State Farm Mutual Automobile Insurance Co.*, 493 F.2d 130, 134 (9th Cir. 1974). Thus we find no invalidity regarding the Kinnard patent.

### B. *Mitchell Patent No. 3,523,343.*

Fabcon and Rauenhorst contest the validity of the Mitchell patent on the grounds of, *inter alia*, lack of novelty due to anticipation by prior art, 35 U.S.C. § 102, and obviousness, 35 U.S.C. § 103. Because of our resolution of the obviousness issue we need not reach the anticipation issue.

■ It is well settled that the question of obviousness is a question of law. *See, e.g., Ralston Purina Co. v. General Foods Corp.*, 442 F.2d 389, 391 (8th Cir. 1971). However, as has been often observed, the test for nonobviousness requires several underlying factual inquiries regarding: (1) scope and content of the prior art; (2) differences between the subject patent and the prior art; (3) the level of ordinary skill in the pertinent art at the time involved; and (4) certain secondary indicia of nonobviousness such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *University of Illinois Foundation v. Winegard Co.*, 402 F.2d 125, 127 (8th Cir. 1968), cert. denied, 394 U.S. 917, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969); *National Connector Corp. v. Malco Manufacturing Co.*, 392 F.2d 766, 769 (8th Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968). Because the question of nonobviousness involves both questions of law and fact, it is fundamental that the trial court must make the ultimate conclusion of law by applying the correct legal criteria to the factual determinations made by the jury. *See Swofford v. B & W, Inc.*, 395 F.2d 362, 367–68 (5th Cir.), cert. denied, 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1968).

Some courts have held that jury findings on the disputed factual matters will be upheld by the reviewing court if substantial evidence exists to support them. *See, e.g., Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 767 (5th Cir.), cert. denied, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980); *Norfin, Inc. v. International Business Machines Corp.*, 625 F.2d 357, 365 (10th Cir. 1980). Many decisions, noting that obviousness is a question of law, have engaged in an independent analysis of the underlying facts on review where the jury returned a general verdict regarding the issue of nonobviousness. *See, e.g., Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.*, 619 F.2d 660, 663–67 (7th Cir.), cert. denied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *Pederson v. Stewart-Warner Corp.*, 536 F.2d 1179, 1180–83 (7th Cir.), cert. denied, 429 U.S. 985, 97 S.Ct. 505, 50 L.Ed.2d 597 (1976); *see also Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 775 (5th Cir.), cert. denied, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980) (Rubin, J., concurring in part and dissenting in part).[5]

plication of earlier filed patent applications. Appellants urge that the earlier filing dates are applicable only to material disclosed in prior applications and carried forward and that the fixed bed casting process finally patented was not disclosed by the first two applications for a moving casting bed apparatus. *See Chisholm-Ryder Co. v. Lewis Mfg. Co.*, 398 F.Supp. 1287, 1289–91 (W.D.Pa.1975), *aff'd without opinion*, 547 F.2d 1159 (3d Cir.), cert. denied, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977).

**5.** The Seventh Circuit described the inherent problems with instructing a jury as to the proper *Graham* criteria:

When the issue is obviousness, a general verdict, with or without answers to special interrogatories, will ordinarily serve no purpose, because the court will still have the responsibility of deciding obviousness. A general verdict, without more, will of course give rise to the presumption that material fact issues have been resolved in favor of the prevailing party; but specific findings are more likely to be useful than presumptions to a court exercising its obligation to decide the ultimate issue of obviousness.

It must be recognized, of course, that at best special verdicts will help some; they will not make trial by jury an effective way of resolving the issue of obviousness. . . . It is apparent, however, that the draftsmen [of Rule 49a] recognized the lack of flexibility that is inevitable when the fact finder responsible for resolving complex and detailed fact issues cannot be expected to compose detailed findings. Nevertheless, the special verdict device may allow the jury, if one is

Regardless of whether we apply the substantial evidence test or accept the jury's special verdict, but independently evaluate the legal question of nonobviousness as an ultimate issue of law, a careful review of the record dictates reversal as to the portion of the judgment upholding the validity of the Mitchell patent.

### 1. Scope of the Prior Art.

Evidence of several prior art patents was presented in the district court. Mortimer Patent, No. 1,891,626, issued in 1932, appears to be the most relevant prior art vis-a-vis the Mitchell patent.

Both Mitchell and Mortimer may be characterized as combination patents[6] for a system for the manufacture of precast planks or slabs.[7] Both patents contemplate four primary structural elements (1) a movable casting bed or mobile carriage with side forms equipped for pivotal movement at the horizontal axes from vertical or outwardly inclined positions for removal of the cured members; (2) a track running beneath a stationary casting apparatus or feed spout; (3) a means for moving the casting bed; and (4) a stationary casting means or feed spout. The Mitchell system claims a curing area and an unloading-overrun area on opposite sides of the manufacturing area in a collinear relationship. The Mortimer patent specification discusses a curing area or part of the plant where the slabs may set adjacent to a manufacturing area, and some sort of unloading area is inherent in any product manufacturing process based on an assembly-line format such as that disclosed in the Mortimer patent. See In re Agger, 249 F.2d 895, 897 (C.C.P.A.1957); Brand v. Thomas, 96 F.2d 301, 303 (C.C.P.A.1938) (doctrine of inherency).

Thus, Mortimer Patent No. 1,891,626 issued in 1932 taught the use of a casting system utilizing a moving casting bed on tracks with longitudinally extended side-forms having pivotal movement at the horizontal axes for ejection of cured materials and a stationary feed spout for pouring plastic material into the forms. In addition, the Kinnard Patent No. 3,217,375 filed in 1962 teaches the process for producing prestressed hollow-core concrete, and is explicitly incorporated into the Mitchell system. Brown Patent No. 2,970,361 issued in 1961 disclosed "a means of molding elongated panels and objects of concrete, or other self hardening material, with core openings extending their full length" and utilizing a moving mold mounted on a horizontal track propelled by motor-driven link chain. The first Kinnard application filed in 1960 discloses a "method and apparatus for continuously forming a hollow concrete member of plastic material" which includes a trough-like casting bed on a carriage frame with pivoting longitudinal side walls adapted to moving longitudinally by "any convenient means," such as a cable, to a stationary hopper frame and then to a curing area.

### 2. Differences Between Subject Patent and Prior Art.

The following primary differences between the Mitchell patent and the prior art are claimed by Span-Deck:

(a) The Mortimer, Brown, and Kinnard patents, as well as the Kinnard application of 1960, fail to disclose the use of two sets of reversible hydraulic motors at opposite sides of the manufacturing area driving rubber-tired wheels having frictional engagement with the stress frame of the casting bed;

---

utilized, to serve a useful function in resolving specific contested issues as to the concrete facts, and it should be used.
Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc., 619 F.2d 660, 667 (7th Cir.) (en banc), cert. denied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).

6. See Huntman Stabilizer Corp. v. General Motors Corp., 144 F.2d 963, 965 (3rd Cir.), cert. denied, 323 U.S. 782, 65 S.Ct. 271, 89 L.Ed. 624 (1944) (combination constituting invention is a union of elements, some of which may be old

and others new, or all old, or all new, but result must be product of coacting influences of various elements and which is produced by their union and not mere aggregation of several results, each the complete product of one of the combined elements).

7. The Mitchell patent covers a system for the production of precast concrete planks, while the Mortimer patent covers the casting of slabs of gypsum or "plastic material;" concrete is a plastic material and, thus, within the contemplation of the Mortimer patent.

(b) the prior art references fail to disclose the use of three areas (unloading, manufacturing, and curing) in the collinear relationship disclosed in the Mitchell patent; and

(c) the prior art references do not specify that the casting beds remain stationary in the curing area, as does the Mitchell patent. Span-Deck also cites such secondary indicia of nonobviousness as the commercial success of the Mitchell patent.

### 3. The Level of Ordinary Skill in the Pertinent Art at the Time Involved.

The primary difference between the Mitchell patent and the Mortimer patent is that the Mitchell patent in claim five provides for a pair of hydraulic motors and frictional engagement of driving wheels with the casting bed as the specific means for accurately moving and controlling the casting bed along the track. The Mortimer patent merely teaches use of a "mobile carriage" driven "either manually or by power" without specifying the means of movement.[8] One must note, however, that claims one, two, three, six, seven, ten, eleven and twelve through fifteen of the Mitchell patent refer only generally to a "means for moving said casting bed along said track." The Mitchell specifications also disclose use of flotation and a cable-type towing mechanism as an alternative means of movement. Nothing unique about the hydraulic motors themselves is claimed; only the use of such motors in conjunction with this particular operation is claimed to be novel and nonobvious. The particular hydraulic motor embodied by the Mitchell invention is a Mark IV Staffa hydraulic motor manufactured by Chamberlain Industries Limited of London, England, Patent No. 3,354,786. Application of a hydraulic drive to the mobile casting bed, while admittedly more accurate and efficient than prior mechanical means, appears to be no more than the work of a skilled mechanic combining two devices both known in prior art.[9]

---

**8.** See generally Automatic Appliance Co. v. McNiece Motor Co., 20 F.2d 578, 580 (8th Cir. 1927) (elements of combination not claimed as invention were presumed old in art).

**9.** See, e.g., General Elec. Co. v. United States, 572 F.2d 745, 767–70 (Ct.Cl.1978) (hydraulic transmission system to drive gun into positional correspondence with pilot device held to be obvious); Globe Tool & Eng'r Co. v. Ram Tool Corp., 403 F.2d 457, 461–62 (7th Cir. 1968) (application of hydraulic drive to automatic armature winding machine found to be obvious); L.B. Smith, Inc. v. Hughes, 190 F.Supp. 787, 795–96 (E.D.Pa.1961), aff'd, 296 F.2d 738 (3rd Cir.), cert. denied, 370 U.S. 953, 82 S.Ct. 1603, 8 L.Ed.2d 819 (1962) (substitution of hydraulic means for mechanical means held to be obvious). Even as early as 1932 the Sixth Circuit so held in Willett Mfg. Co. v. Root Spring Scraper Co., 55 F.2d 858, 859–60 (6th Cir. 1932), stating in language equally applicable to this case:

> The use of mechanical means for raising or lowering the blade of a road scraper is almost as old as the use of such scrapers. Invention may be exercised in devising a specific form of hydraulic means for accomplishing this end, just as in improving the mechanical means for doing so; but merely substituting hydraulic, pneumatic or electrical means for the former manually operated mechanical means, is but the substitution of one well-recognized source of power for another, and ordinarily is not broadly patentable. An exercise of the inventive faculty is not required to conceive, without more, that such substitution may be made. . . .
>
> It is true that where the availability of the old device to use in the new environment is not obvious, either because of intrinsic differences in the quality of the operation to be performed, or because the relationship between the two arts or fields of use is remote, invention may be found in the mere concept of such availability to useful service in the new and different environment ... but this principle is inapplicable here. The field of use is essentially the same whether the work performed be raising an elevator, a dump truck body, or a scraper blade. In this sense the relationship between the arts is not remote. Choice of one or another of the available types of power, apart from the specific means by which such power unit is adapted to the new use, is well within the domain of selection open to the public. . . . The validity of the patent must then depend upon the existence of a true combination in the specific means disclosed; and an exercise of the inventive faculty is to be found, if at all, in the changes in the old device necessary to adapt it to the new use, and which therefore and thereby produce the new combination.

55 F.2d at 859.

■ Span-Deck claims that the Mitchell patent discloses a nonobvious invention not included in the prior art by specifying collinear configuration of the unloading, manufacturing, and curing areas which creates greater efficiency. While none of the prior art references specifically teach a system with an unloading area on one side of the manufacturing area and a curing area on the opposite side, the Mortimer patent does refer to pushing the carriage "to a part of the plant where the material in the molds will be permitted to set until ready for removal," and the Brown patent discloses a curing area at the end of the track where a steel sheet is placed over the top surface of the poured concrete and "[t]he molded, cored object remains on pallet until cured sufficiently to handle." Furthermore, the Kinnard application of 1960 refers to removing the carriage frame "to a curing station until the concrete has set." Although none of the prior art references mention a specific unloading overrun area, it is only logical that such an area must exist *at some point* on the assembly line. The particular collinear configuration taught by the Mitchell patent appears to be no more than an obvious rearrangement of parts to be considered by anyone experimenting in the field. It is well-settled that more than mere change of form or rearrangement of parts is necessary for patentability. *See, e.g., Stephenson v. Brooklyn Cross-Town Railroad*, 114 U.S. 149, 154, 55 S.Ct. 777, 779, 29 L.Ed. 58 (1885); *National Connector Corp. v. Malco Manufacturing Co.*, 392 F.2d 766, 770 (8th Cir.), *cert. denied*, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968); *Ajax Mfg. Co. v. National Mach. Co.*, 93 F.2d 344, 346 (6th Cir. 1937); *DeBurgh v. Kindel Furniture Co.*, 125 F.Supp. 468, 476 (W.D.Mich.1954), *aff'd*, 229 F.2d 740 (6th Cir.), *cert. denied*, 352 U.S. 823, 77 S.Ct. 30, 1 L.Ed.2d 47 (1956). The particular collinear configuration taught by the Mitchell patent appears to be no more than a logical and obvious step forward

which accomplishes no new and unexpected result, but which is admittedly of economic importance. *See Shell Development Co. v. Pure Oil Co.*, 111 F.Supp. 197, 210 (D.D.C. 1953), *aff'd sub nom. Pure Oil Co. v. Socony-Vacuum Oil Co.*, 212 F.2d 454 (D.C.Cir. 1954).

Finally, the use of a stationary curing area is taught by the Mitchell patent, but is not explicitly specified in the prior art. Larry Foster, appellee's own witness, admitted, however, that such a curing technique, while not inherent in the process, is an accepted practice in the concrete industry.

■ Based on the legal criteria previously discussed, we hold as a matter of law that the experimental skill needed to combine these features would require no greater degree of ingenuity or skill than that possessed by an ordinary mechanic skilled in the art of manufacturing precast plastic materials.[10] We hold that the discernible differences between the Mitchell patent and the prior art are obvious improvements and combinations of existing machines, processes, and systems. *Cf. University of Illinois Foundation v. Winegard Co.*, 402 F.2d 125, 127 (8th Cir. 1968), *cert. denied*, 394 U.S. 917, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969).

In sum, notwithstanding the commercial success enjoyed by Span-Deck, the Mitchell "system" appears to be at most an obvious technological advance not amounting to a patentable invention. As this court previously stated:

> The change in the form of any element of a prior patent must result in more than a useful natural phenomenon which man has accumulated through common knowledge. Thus, even though the use of a new device greatly improves the field and provides great utility, and commercial success is enjoyed because of the long-felt

---

10. Substantial evidence of the commercial success of the Mitchell patent was adduced at trial. While such evidence is relevant to the question of unobviousness, in this case it appears to prove only the existence of a good machine, not a good patent. *See Cook Eng'r &*

*Elec., Inc. v. Hickory Foundry & Mach. Co.*, 231 F.Supp. 271, 274 (W.D.N.C.1964), *aff'd*, 340 F.2d 235 (4th Cir. 1965). *See also American Infra-Red Radiant Co. v. Lambert Indus., Inc.*, 360 F.2d 977, 990 (8th Cir.), *cert. denied*, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

need, these features cannot sustain patentability where involved is only an extended application of obvious attributes from the prior art. Cf. *Frederick Stearns & Co. v. Grove's Laboratories, Inc.*, 87 F.2d 822, 824 (8 Cir. 1937). *National Connector Corp. v. Malco Manufacturing Co.*, 392 F.2d 766, 771 (8th Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968).

## II. *Tortious Inducement.*

Rauenhorst contests the jury's findings of tortious inducement of Fabcon to breach the contract on the grounds, first, that any inducement was justified as a matter of law under *Lear, Inc. v. Adkins.* Alternatively, it is argued that the district court failed to properly instruct the jury as to the elements of tortious inducement.

In *Snowden v. Sorenson*, 246 Minn. 526, 75 N.W.2d 795 (1956), the Minnesota Supreme Court set forth the following elements essential for recovery of damages for inducing breach of contract: "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom. *Royal Realty Co. v. Levin*, 244 Minn. 288, 292, 69 N.W.2d 667, 671; *Sorenson v. Chevrolet Motor Co.*, 171 Minn. 260, 214 N.W. 754, 84 A.L.R. 35." 75 N.W.2d at 799.

In *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court held that (1) a patent licensee is not estopped from challenging patent validity, id. at 671, 89 S.Ct. at 1911; and (2) overriding federal patent policy allows a licensee to discontinue royalty payments while challenging patent validity, id. at 673–74, 89 S.Ct. at 1912–13. Rauenhorst

asserts that *Lear* establishes Fabcon's right to refuse to pay royalties, the alleged breach in this case, and that because Fabcon was "justified" in its actions, its sole owner Rauenhorst was neither unreasonable nor unjustified in urging it to so act.[11]

The question presented is what action is justified under *Lear.* In *Lear*, a licensing agreement was entered into before any patent was issued. The terms of the agreement required that royalties be paid until such time as the patent was held invalid. The licensee ceased payment of royalties while the licensor was still applying for the patent and notified the licensor of its belief that the patent sought was invalid. Upon receiving the patent licensor brought a breach of contract action, and the licensee asserted the defense of patent invalidity. Notwithstanding the contract provision requiring the payment of royalties until a determination of patent invalidity, the Supreme Court held that the licensee could challenge a patent's validity and be "freed from liability at least from the time he refuses to pay the contractual royalties." 395 U.S. at 674, 89 S.Ct. at 1913. Therefore, "*Lear* permits an accused infringer to accept a license, pay royalties for a time, and cease paying when financially able to litigate validity, secure in the knowledge that invalidity may be urged when the patentee-licensor sues for unpaid royalties." *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 346, 91 S.Ct. 1434, 1451, 28 L.Ed.2d 788 (1971).

Several courts have discussed the questions of whether mere cessation of royalties will suffice under *Lear* and what comprises a challenge to validity. Although a chal-

---

11. Span-Deck attempts to refute this argument by stating that justification is an affirmative defense, as opposed to an element of the tort, see *Johnson v. Radde*, 293 Minn. 409, 196 N.W.2d 478, 480 (1972), and that Rauenhorst not only failed to plead it in its answer or counterclaim, but it also denied any inducement at trial. Span-Deck contends, therefore, that Rauenhorst is barred from raising the justification issue.

In *Royal Realty Co. v. Levin*, 244 Minn. 288, 69 N.W.2d 667 (1955), the Minnesota Supreme

Court took a position regarding justification somewhat reconciling its divergent approaches in *Snowden* and *Johnson*; lack of justification must be plead by the plaintiff in a tortious interference action, but the burden of proving justification is on the defendant. 69 N.W.2d at 673. Because appellant's answer and counterclaim plead patent invalidity, thereby implicitly pleading justification, and because appellants offered proof of invalidity at trial, we deem the issue of justification is not barred on appeal.

lenge does not necessarily require that the licensee initiate the adjudication regarding patent validity, *see Lear; Blonder-Tongue; Troxel Manufacturing Co. v. Schwinn Bicycle Co.,* 465 F.2d 1253, 1260 (6th Cir. 1972), *cert. denied,* 416 U.S. 939, 94 S.Ct. 1942, 40 L.Ed.2d 290 (1974); it is at least apparent that the reason for cessation of royalties must be patent invalidity. *See PPG Industries, Inc. v. Westwood Chemical, Inc.,* 530 F.2d 700, 706–07 (6th Cir.), *cert. denied,* 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976). However, because the policy behind the *Lear* decision was the public interest in early adjudication of patent invalidity, *see PPG,* 530 F.2d at 705, two circuits have held that more than mere nonpayment of royalties is required; the licensee must take the additional affirmative step of *notifying* the patentee-licensor of invalidity. *PPG; American Sterilizer Co. v. Sybron Corp.,* 614 F.2d 890, 897–98 (3d Cir.), *cert. denied,* 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980).

■ Fabcon ceased payment of royalties in February 1973. In March 1973 Fabcon's president proffered the reason of entitlement to a credit under a "most-favored-licensee" clause, but in April 1973 Gerald Rauenhorst asserted on behalf of Fabcon the claim of patent invalidity. It appears, therefore, that Fabcon's actions were authorized under *Lear* at least as of the time of Rauenhorst's involvement in April 1973 and that any urging by Rauenhorst to do that which Fabcon was legally entitled to do was justifiable under the circumstances. Because Rauenhorst established justification or "the presence of exceptional circumstances which show that no tort was in fact committed and lawful excuse which excludes actual and legal malice," *Johnson v. Radde,* 293 Minn. 409, 196 N.W.2d 478, 480 (1972), the district court should either have directed a verdict for Rauenhorst on the tortious inducement claim or entered a judgment notwithstanding the verdict.

Because it appears that a verdict should have been directed for Rauenhorst, the issue of jury instructions need not be reached. In addition, the issues involving Rauenhorst's liability for compensatory and punitive damages need not be resolved.

### III. *Hybrid Royalty.*

■ Span-Deck disputes the applicability of *Lear* in this case because the franchise contract is not a naked patent license; the consideration for the royalties was found to be not only patent rights, but also nonpatent consideration such as trade secrets. Because of the hybrid nature of the royalty, Span-Deck asserts that the *Lear* doctrine of patent law overriding the law of contracts is inapplicable and that *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979), is more closely analogous.

In *Aronson,* the licensee agreed to pay a royalty of five per cent of the selling price of a product manufactured according to a specific design. The agreement provided that if a patent on the design was not allowed within five years, the royalty would be reduced to two and one-half per cent. The patent was not allowed within five years and was ultimately rejected. The licensee subsequently sought a declaratory judgment that the royalty agreement was unenforceable on the grounds that federal patent law pre-empted state contract law. The Supreme Court held that federal patent law did not pre-empt state contract law so as to preclude enforcement of the contract because nothing in the state contract law stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in federal patent law. 440 U.S. at 262, 99 S.Ct. at 1099. The Court found that the patent monopoly rights were not used as leverage to negotiate the reduced royalty since the reduced royalty rested on the contingency that no patent would issue within five years. 440 U.S. at 264–65, 99 S.Ct. at 1100–01. *See Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964) (monopoly granted under a patent cannot lawfully be used to negotiate nonpatent royalties with the leverage of that monopoly). The Court also found that the agreement did not fall within the *Lear* rationale of encouraging the early adjudication of patent validity to further the strong federal policy of insuring that only inventions which meet the rigorous requirements of patentability are with-

drawn from the public domain because, in *Aronson,* no patent ever issued and no ideas were withdrawn from public use. 440 U.S. at 264, 99 S.Ct. at 1100.

*Lear* appears to be more closely applicable to this case than *Aronson.* First, patents were issued in this case, thereby removing certain ideas from the public domain. Second, the patents necessarily were used as leverage to negotiate the hybrid royalty in this case, unlike the reduced royalty in *Aronson.* Finally, the terms of the contract itself make the *Lear* rationale more applicable. Paragraph 4.1 provides:

> In the franchise area, LICENSEE will cooperate with LICENSOR at the sole cost and expense of LICENSOR in taking such legal action as might be reasonably necessary to protect said trademarks, LICENSOR'S processes, and the patents thereon. In the event a final judgment should be entered in a Court of competent jurisdiction determining (a) That the right to the use of the name SPAN–DECK is not exclusively vested in LICENSOR and its LICENSEE, for the manufacture of such product in the territory covered by this agreement, or (b) That LICENSOR'S machine and/or processes are not protected by LICENSOR'S patents, with the effect that persons not licensed by LICENSOR may utilize same without liability for infringement, or with the effect that use of same is deemed an infringement of patents owned by persons other than LICENSOR, then LICENSEE may, at its option, terminate this license agreement by giving 60 days notice by registered mail, whereupon both parties will be released from all obligations under this agreement except that LICENSEE shall not be released from its Agreement to pay royalties already due or any other accrued obligation, nor from any other agreement herein contained which is stated to be binding subsequent to termination of this contract.

Thus, the *entire* royalty is avoidable under the contract in the event that the patents are invalid; no allocation of the percentage of royalties attributable to trade secrets and know-how is provided. The contract language indicates the primary importance of the patent rights in determining consideration.

The Ninth Circuit encountered a similar situation in *St. Regis Paper Co. v. Royal Industries,* 552 F.2d 309 (9th Cir.), *cert. denied,* 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977). In that case, the court found the underlying patent invalid and held unenforceable a royalty agreement which failed to distinguish between patent rights and know-how rights. The court stated:

> When, as here, the patent rights and the know-how are so intimately intertwined, we believe that the same rule which makes royalties for patent rights uncollectible if the patent is invalid should apply with equal force to know-how. This does not mean Royal will be deprived of compensation for know-how; it merely means Royal is not entitled to royalties under the license agreement, which did not distinguish between royalties for patent rights and royalties for know-how.

> . . . .

> We hold that section 12(b)(1) is unenforceable for both the patent rights and the know-how. Nevertheless, we believe that Royal is entitled to compensation for its know-how.

552 F.2d at 315.[12]

The court continued with a discussion of damages and the reasonable value of the know-how, premised ostensibly on grounds of unjust enrichment. *See Dusenka v. Dusenka,* 221 Minn. 234, 21 N.W.2d 528, 530–31 (1946).

---

**12.** If the "hybrid" royalty were held enforceable, any licensor could undermine *Lear* by simply combining patent rights with other consideration in a royalty agreement and by providing no differentiation between the two considerations. If held enforceable despite patent validity, such an agreement would prevent the "unmuzzling" of royalties to aid the licensee in the expense of challenging patent validity, which achieves a result directly contradictory to that sought in *Lear.*

## IV. *Letter of Termination.*

Paragraph 4.3 of the franchise/license contract entered into on October 7, 1970, contains the following provision:

This Agreement may be renewed at the option of the LICENSEE for an additional period of five (5) years, and thereafter for additional periods of five (5) years, provided that LICENSEE shall not be in default under any provisions of this Agreement. Renewal shall be automatically effected unless LICENSEE gives written notice of its intention not to renew to LICENSOR, at least six (6) months prior to the expiration of the original term of this Agreement or any renewal term.

Defendants alleged at trial that on April 2, 1975, Fabcon gave an unambiguous written notice of nonrenewal by way of letter to Span-Deck, thus terminating the agreement as of October 6, 1975.[13] They argued, therefore, that if they are liable for compensatory damages, such damages should be limited to those incurred from the time of the alleged breach until the contract's alleged termination in October 1975.

The district court submitted the issue to the jury and the jury found that renewal occurred as of October 1975 in accordance with the franchise contract's terms, assessing compensatory damages of $1,500,000. The district court justified submission of the issue to the jury on the grounds that the question involved resolution of certain factual issues upon which the evidence was in dispute including whether Fabcon's notice of nonrenewal was unambiguous.

Fabcon contends that the nonrenewal notification letter is unambiguous on its face and that the district court improperly found that Fabcon's subsequent actions created ambiguity. Because Fabcon ceased making royalty payments and ultimately terminated the contract based on its assertions of patent invalidity, Fabcon argues that its continued production was not inconsistent with the post-termination requirements of paragraph 4.4, but, in fact, was consistent with its notice of nonrenewal. Thus damages should have been cut off as of October 6, 1975.

Span-Deck urges that Fabcon's failure to comply with paragraph 4.4 is evidence of its intent to renew the agreement, creating an ambiguity, and thereby justifying submission of the issue to the jury. Span-Deck further contends that Fabcon's "default" precluded its exercise of the right of nonrenewal. Finally Span-Deck contends that, even if Fabcon effectuated a timely notice of nonrenewal, the jury's damages should be allowed to stand as damages for Fabcon's illegal use of trade secrets and for patent infringement occurring after the October 1975 termination date.

 We find the notice of nonrenewal clear and unambiguous. Span-Deck's admission of the October 1975 termination is further evidence of the parties' understanding regarding renewal of the agreement. In light of this and Fabcon's reasons for ceasing payment of royalties and not renewing the franchise agreement, the continued use of "patented processes" does not appear to be inconsistent conduct creating an ambiguity.

---

**13.** On April 2, 1975, Fabcon's attorney wrote the following to Span-Deck:

Re: LICENSE AGREEMENT dated 7 October, 1970, between Span-Deck, Inc. and Fabcon, Incorporated

The above identified Agreement has been terminated by the actions of the parties thereto.

However, in view of the contention made by Span-Deck, Inc. in the present litigation between the parties that the Agreement is not terminated, and to avoid any claim by Span-Deck, Inc. that the original term of the Agreement has been automatically extended for an additional five-year term, our firm has been authorized by Fabcon, Incorporated to give formal notice under Paragraph 4.3 of the Agreement, that Fabcon, Incorporated does not intend to renew the Agreement on expiration of the original term thereof on 6 October, 1975.

Additional evidence of the 1975 termination date was appellee's own admission found in a supplemental answer to Fabcon's Interrogatory No. 1 which states in pertinent part:

The following parties who were licensees at the time of plaintiff's original answer are no longer licensees:

| Licensee | Date of Agreement | Date of Termination |
|---|---|---|
| Fabcon, Inc. 700 W. Highway 13 Savage, Minnesota 55378 | 10/7/70 | 10/7/75 |

The district court's determination of whether an ambiguity exists in a written document is a question of law, *see Republic National Life Insurance Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979), and is thus subject to review by this court. The intent of the parties may be gained entirely from the writings in this case; therefore, the construction and effect of the written contract and notice letter were questions of law to be resolved by the court, not by the jury. *See Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979); *Leslie v. Minneapolis Teachers Retirement Fund Ass'n*, 218 Minn. 369, 16 N.W.2d 313, 315 (1944).

As to Span-Deck's contention regarding the effect of default on Fabcon's right to exercise the nonrenewal option, it appears that the district court properly concluded under paragraph 4.3 of the agreement that Fabcon's right to renew was contingent on absence of default, but the right of nonrenewal was not so qualified. The alleged breach had no effect on Fabcon's timely notification of intent to nonrenew.

*Conclusion.*

In light of our finding regarding the invalidity of the Mitchell patent and the date of termination of the contract, it is apparent that the trial court erred in allowing the jury to assess compensatory damages based on unpaid royalties for the period after October 7, 1975. Span-Deck's contention that the damages included for that time period should be allowed to stand because such a computation is a fair method of computing damages for unauthorized use of trade secrets is not convincing. Although the jury found that Fabcon continued to use Span-Deck's trade secrets acquired as a result of a confidential relationship with Span-Deck, and although a "reasonable royalty" is one fair method of computing damages in such a case, *cf. University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539–40 (5th Cir. 1974) ("reasonable royalty standard" one measure of damages for misappropriation of trade secrets), it does not follow that the jury would have necessarily computed the same damages had it treated the contract as terminated as of October 1975. In sum, a

remand for determination of compensatory damages based on the value of nonpatent consideration received by Fabcon during the period from cessation of royalties until the October 1975 contract termination and damages for the misappropriation of trade secrets after contract termination is in order.

Because the withholding of royalties when challenging patent validity is authorized under *Lear*, thereby justifying any encouragement by a parent corporation to a wholly-owned subsidiary to so act, the judgment against Rauenhorst is reversed. Because the jury found the Kinnard patent uninfringed, and because the Mitchell patent is invalid due to obviousness, the judgment against Fabcon for breach of contract is reversed; however, because the jury found that Fabcon received nonpatent consideration, the cause is remanded for a determination of the value of nonpatent rights received by Fabcon from the time Fabcon ceased payment of royalties until termination of the contract on October 6, 1975. In addition, a determination of damages for misappropriation of trade secrets after the contract termination is ordered.

The judgment is vacated and the cause is reversed and remanded for further proceedings in accord with this opinion.

ARNOLD, Circuit Judge, concurring.

I concur in the Court's opinion but add a few words to make clear where I stand on the question of this Court's reviewing function in patent cases. I agree completely with Judge Woods that the findings of the District Court to which a patent case is tried without a jury must be reviewed here in accordance with the clearly erroneous standard. As the author of the Court's opinion in *Contico Int'l, Inc. v. Rubbermaid Commercial Prods., Inc.*, 665 F.2d 820, 823 (8th Cir. 1981), cited by Judge Woods, *post*, p. 1250, I could do no less. I also agree that if a patent case is tried to a jury the verdict should be reviewed on appeal with the same deference that is given a jury verdict in any other kind of case.

I do not read the Court's opinion in this case as giving no weight or consideration to the jury verdict below. I read it, rather, as holding that the Mitchell patent is so clearly invalid that no jury question was made out. On that basis, I concur in the opinion of the Court and in its judgment.

WOODS, District Judge, sitting by designation, concurring in part and dissenting in part.

I concur in Part IV of the majority opinion which addresses the issues presented by the letter of termination. In all other respects, I dissent.

Contrary to the underlying factual findings made by both the jury and District Court and the conclusions of law made by the District Court, the majority opinion concludes that the Mitchell patent is invalid. Applying the doctrine espoused in *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1966), the majority opinion proceeds to vacate the judgment entered in favor of the plaintiff and remand the case to the District Court for a determination of the value of nonpatent rights from the date Fabcon ceased payment of royalties to the termination date of October 6, 1975. Additionally, the District Court is directed to determine damages for misappropriation of trade secrets after contract termination.

While I acknowledge that it is well settled that the ultimate question of obviousness is a question of law (Maj. Op. at 7), it is equally well settled that this determination is one which "lends itself to several basic factual inquiries." *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Clark Equipment Co. v. Keller*, 570 F.2d 778, 789 (8th Cir. 1978). These factual inquiries, of course, are resolved either by the District Judge or a jury. The scope of review to be applied to the determination of obviousness at the trial level and the weight which should be given to the jury verdict or the District Court's findings on these issues have given this Circuit great difficulty. *Flour City Architectural Metals v. Alpana Aluminum Products, Inc.*, 454 F.2d 98 (8th Cir. 1972); and *Clark Equipment Co. v. Keller, supra.* In *Contico Intern v. Rubbermaid Commer-*

*cial Products*, 665 F.2d 820 (8th Cir. 1981), the clearly erroneous standard was applied in reviewing the trial judge's findings. Consistency with this decision dictates that a jury verdict on these same issues be tested by the substantial evidence test. However, the majority opinion acknowledges two different approaches to the obviousness vel non issue—substantial evidence test of a jury verdict and an independent analysis of the underlying facts by the appellate court—and states that the result would be the same in the instant case under either approach. The majority then focuses on an independent analysis of the evidence and arrives at the conclusion that the Mitchell patent must be invalidated. In reaching this conclusion, no weight was given to the special jury verdicts which dealt with the obviousness issue. Further, no consideration was given to the District Court's independent evaluation of the evidence and conclusion that the Mitchell patent was valid. (Designated Record p. 147).

In *E.I. DuPont de Nemours v. Berkley & Co., Inc.*, 620 F.2d 1247, 1264 (8th Cir. 1980), this Circuit, in an opinion written by the Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation, emphasized that "[t]he parties are entitled to a consideration in the first instance of all the facts touching the obviousness issue, by a factfinder who sees and hears the witnesses . . . ." Surely, given this emphasis, the parties are entitled to have this factfinder's consideration accorded some weight.

The majority's concern with the difficulty of submitting the complex issue of obviousness to a jury has some logical appeal (Maj. Op. 1241). But, once a proper demand for jury trial has been made and a jury trial is conducted, the appellate standards of review of a jury verdict should not be compromised because of the complexity of the issues presented.

The majority also relies on *Lear v. Adkins, supra,* to hold that any alleged tortious inducement was justified as a matter of law. Given the majority's opinion on the patent validity issue, the argument that

Rauenhorst was justified in inducing Fabcon to cease royalty payments has some force. But, in Minnesota, justification is peculiarly a fact issue to be determined by the jury. *Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965); *Johnson v. Radde*, 293 Minn. 409, 196 N.W.2d 478 (1972). If the jury was not properly instructed on the *Lear v. Adkins, supra*, justification issue, the proper procedure would be to remand the case for a redetermination by the jury.